278 So.2d 24 (1973)
REILLY-BENTON COMPANY, INC. and the Peabody Corporation, Plaintiffs-Appellants-Applicants,
v.
LIBERTY MUTUAL INSURANCE COMPANY, Defendant-Appellee-Respondent.
No. 52518.
Supreme Court of Louisiana.
May 7, 1973.
Deutsch, Kerrigan & Stiles, Frank J. Peragine, James A. Burton, New Orleans, for plaintiffs-applicants.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre, James R. Murrell, III, New Orleans, for defendant-respondent.
CALOGERO, Justice.
Reilly-Benton, Inc. and an allied company, The Peabody Corporation filed this lawsuit seeking to recover $13,066.08, being the unpaid portion of a fire loss to furniture, fixtures, and an inventory of mercantile stock stored in a warehouse located in Baton Rouge and insured under a Special Multi-Peril Insurance policy by the defendant, Liberty Mutual Ins. Co.[1] Invoking a penalty provision of the policy, the defendant had paid only $44,683.01 of the actual $57,749.00 loss incurred.
Reilly-Benton Co., Inc., is a Louisiana corporation with its principal place of business and corporate headquarters located on Tchoupitoulas Street in New Orleans. At the time of the fire, Reilly-Benton operated two warehouses on Tchoupitoulas Street and one on Sorrell Street in Baton Rouge, Louisiana. From the Baton Rouge location as well as those in New Orleans, Reilly-Benton sells construction and maintenance supplies such as insulation, duct work and air conditioning filters. In addition to warehousing goods for sale, the Baton *25 Rouge location maintains a sales office.
The Peabody Corporation is owned by Howard Peabody and is domiciled in Maryland. Its Louisiana operation is housed in the same Baton Rouge warehouse as Reilly-Benton and its operation is entirely under the supervision and control of Reilly-Benton. In his testimony, Reilly-Benton comptroller Milton L. Bauer stated that these services were rendered to Peabody Corporation pursuant to a written agreement for a stipulated fee. The agreement includes maintaining the inventory and books of Peabody in Louisiana and rendering quarterly and yearly accounting to Peabody. The Peabody Corporation's inventory was physically segregated from Reilly-Benton at the time of the fire but was stored in the same warehouse.
On April 20, 1972 Reilly-Benton and Peabody had in effect with the defendant insurer a Multi-Peril insurance policy which provided, among other things, coverage for fire loss of their merchandise at the Baton Rouge warehouse. On that date a fire occurred at the Baton Rouge warehouse, substantially damaging all of the merchandise of Reilly-Benton and Peabody.
The plaintiffs made a claim under the aforementioned policy for the actual cash value of the merchandise destroyed in the fire. The defendant insurer invoked a penalty povision of the policy and paid all but $13,066.08 of the loss, the amount being the alleged penalty for undervaluing of inventory by Reilly-Benton and Peabody.
The pertinent policy provisions relative to fluctuating stock inventories (as the plaintiffs maintained in their warehouse), and comprising what is commonly referred to as a "monthly reporting policy," are found in that part of the policy entitled "Reporting EndorsementSpecific Rate, Coverage Bpersonal property only."[2] (see footnote for policy provisions)
*26 In order to fully comprehend the operation and purpose of a value reporting policy as is involved here and more importantly the penalty provisions thereof the reader is referred to the following quotation from Camilla Feed Mills v. St. Paul Fire and Marine Ins. Co., 177 F.2d 746, 747 (5th Cir. 1949) in which a similar policy was at issue.
"The policy involved in this case was intended to offer to the owners of fluctuating businesses the opportunity of full insurance coverage while at the same time exacting from the insured only the amount of premiums figured on the average monthly amount of reported inventory. Thus the owner of a stock of goods that would fluctuate from $1000 one month to $9000 the next month could insure his property under this policy and pay a premium on the monthly average of his reported inventory, and be protected. He would not have to take out specific insurance on the stated amount of $9000 to protect his maximum or $1000 to protect his minimum. The one big obligation placed on the insured under such a policy was that he report to the company, not later than thirty days after the last day of each month, the exact value of such property covered under the policy, its exact location, and all other specific insurance in force on the same. (Emphasis ours)
". . . After the final premium was calculated from the average of the monthly reported values of inventory provided for in the policy, the insured was either given a refund if it had paid too much, or asked to pay more if it had paid too little, on the original payment of three-fourths of the premium of the limit of the liability. From such a method of computing the premium, it can easily be recognized that the insured in order to save premiums, might not correctly report the true value of his inventory. During the term of a policy, an insured could mistakenly underestimate the amount of his inventory and, if there were no loss, pay a premium based on such under-estimated amounts; and if, during the term of the policy, a loss occurred, he could simply ask the court to correct the erroneous estimate that had been made. In this way, according to [the insurer's] contentions, an insured could easily escape the payment of the correct amount of premiums where there was no loss; and in the event of a loss, he could collect the full amount of his policy by offering to pay an additional amount of premiums. In order to offset this advantage to the insured, the policy contains a provision to the effect that the liability of the insurer shall not exceed that portion of any loss sustained which the last reported value, filed prior to loss, bears to the actual value of the inventory on the date for which the report was made."
See also Peters v. Great American Ins. Co., 177 F.2d 773 (4th Cir. 1949); Federal Intermediate Credit Bank v. Globe and Rutgers Fire Ins., 7 F.Supp. 56 (D.C.1934) and Rolane Sportswear Inc. v. U. S. F. & G. Co., 407 F.2d 1091 (6th Cir. 1969).
The policy required the insured to report not later than 30 days after the last day of each calendar month, the exact location of all property covered and the total actual cash value of such property at each location.
*27 There is no contention that plaintiff had not timely complied with the reporting requirement. He did, in fact, file on a monthly basis, the appropriate form with defendant, as to location and amount, and showing for the Baton Rouge location the following values:

 Fixture Total
 Stock Value Value
January 36,442 6,300 42,742
February 36,863 6,300 43,163
March 53,235 6,300 59,535

It is to be noted that according to policy provisions relating to monthly reporting, Reilly-Benton was not required to report separately nor was there ever any distinction made between merchandise of Reilly-Benton and that of Peabody in either the Baton Rouge warehouse or the two New Orleans warehouses.
The fire took place on April 20, 1968. The Comptroller contended that the March report was mailed to the Dallas Office of Liberty Mutual on April 18, 1968.[3] The report was received through the mail at Dallas on April 24, 1968, four days after the fire.
Whether the March statement was filed, or reported, before or after the date of the fire would ordinarily have been of no moment, for if the February report, even though showing less stock than the March report, had accurately valued the stock in the Baton Rouge warehouse on February 29, 1968, the full loss (subject to the policy limits of $75,000) would have been payable. See Reporting Provisions, Paragraph III A of the policy, supra, "it being the intent of this insurance to insure hereunder the total actual cash value of the property described herein" (namely, the property not in excess of the policy limits, located at the Baton Rouge warehouse).
However, upon audit it was shown that the February report had not accurately stated the value of stock at the Baton Rouge warehouse on February 29, 1968. Rather than $36,863 ($43,163 including fixtures) as reported, the actual value of the stock was $50,161 ($56,461 including fixtures).[4]
Liberty Mutual, therefore, invoked the penalty provision of Paragraph III C, the Full Reporting Clause[5] and allowed plaintiff only 74.4% of the $57,749 loss based on the undervaluation contained in the February report.
Plaintiff contends that his March report was "filed" (and thus should be construed as the last report prior to the fire) when on April 18, 1968 it was deposited in the mail. While the March report corrected certain "bookkeeping errors" which had in part caused February's stock to be undervalued in its report, it did not even then fully report the stock in the Baton Rouge warehouse on March 31, 1968, for we are satisfied with the showing made by defendant that it still excluded the entire Peabody Corporation stock in the sum of $9,369. Consequently, even if we were to accept the April 18 "filing" of the March report we would still be required to deny plaintiff a portion of the loss (although perhaps less *28 than the $13,066, which Liberty Mutual denied them, and which sum is at issue in this litigation).
We need not get into this computation, however, inasmuch as we agree with the position taken by defendant and concurred in by both the District Court and the Court of Appeal, that the last report "filed" prior to the loss was that for the month ending February 29, 1968.
Plaintiff in support of his position that the March, rather than the February, report should prevail under the policy, contends that the issue turns on the interpretation of the words "file" and "filed," directing our attention to the second sentence of Paragraph III B, supra.
"At the time of any loss if the insured has failed to file with the Company reports of values as above required, this policy, subject otherwise to all its terms and conditions shall cover only at the locations and for not more than the amounts included in the last report of values filed prior to the loss, * * *"
While we are of the opinion that this sentence, setting limited recovery in the event reports are not filed in accordance with the policy, is not applicable here where the reporting requirements were fully met, and that the pertinent applicable penalty provision is found rather in Paragraph III C, which speaks not of "file" or "filed," but "reported," we nonetheless are willing to give inferential effect to the words "file" or "filed," in Paragraph III B and to interpret them along with the word "reported," in order to ascertain whether defendant may look to the February or the March report as the last report prior to the loss.
Plaintiff contends that "filed" can and does include depositing in the mail.
There is no ambiguity in the words "reported" and "filed" as used in the monthly reporting policy. The obvious and simple meanings found in Webster's New International Dictionary, Second-Edition, should suffice. "Report" or "reported" there is defined as "to give notification of." File means "to deliver to the proper officer so that it is received by him to be kept on file among the records of his office." Supporting this common sense definition of "file" is the case of McGee v. So. Farm Bureau Casualty Ins. Co., 125 So.2d 787 (La.App. 3rd Cir. 1960), which declared that "filed" means delivered into actual custody. See also State ex rel. Denny v. Members of Caddo Parish, etc., 201 La. 483, 9 So.2d 657 (1942). The obvious import of the words "reported" or "filed" is that the intended recipient of the document to be "filed" or "reported" actually receive the document. One does not report until the recipient receives "notification" of the report; one has not filed until the recipient has received custody of the document.
Thus, we conclude that the words "reported" and "filed" mean transmitted to, and delivered unto, the insurer, both by simple definition and in the necessary context in which such words are used in this "monthly reporting policy." Depositing in the mail prior to the loss does not constitute reporting to, or filing with the insured prior to the loss. Consequently, defendant properly used the February report, and there being an undervaluation of merchandise in this report, properly imposed the penalty provision of Paragraph III C.
Plaintiff further contends that while there was a mistaken undervaluation of the Baton Rouge warehouse inventory in the February report, there was a corresponding overvaluation of one of the New Orleans warehouse inventories in the February report.[6] And he argues that the *29 net adverse result to the insurer, premium-wise, is small. He would thus have us reform his February report, (or his March report if we were to accept it as filed prior to the loss), to properly state the value of stock in the Baton Rouge warehouse on February 29, 1968 (thereby avoiding imposition of the penalty). The policy in Paragraph III C clearly required that the value have been reported "at the location where the loss occurs." One reason for this strict requirement that reports accurately reflect the value of inventory at each location is that fire insurance rates vary from location to location. It was shown, for instance, that the rate for the location of the Baton Rouge warehouse was three times that rate applicable to plaintiff's New Orleans warehouses. Suffice it to say that plaintiff's mistakes were not inconsequential, and the policy requirements were clear and unambiguous.
An effort to reform erroneous value reports (insured's mistake) in a similar monthly reporting policy case was treated thusly in Rolane Sportswear, Inc. v. U. S. F. & G., supra:
"... We determine, however, that appellant is not entitled to reformation of its reports. The District Court found that the inaccuracy of the figures contained in the reports was caused solely by appellant's own internal mistakes and this finding is supported by the record. Under the law of Tennessee, unless a claim for reformation is based upon mutual (rather than unilateral) mistake, or is induced by fraud on the part of one party, relief is unavailable ... Our decision is consistent with Silver Fox Co., Inc. v. New York Indemnity Co., 125 Misc. 430, 210 N.Y.S. 18 (Supreme Ct. 1925), in which reformation was denied under facts almost identical to those of the instant case. It concerned a reporting policy which insured goods against burglary and under which the insured erroneously reported the value of goods at a particular location as $1,100 when, in fact, the value was $11,000 ...
". . . It is also clear that appellant is not entitled to rescission of the erroneous value reports. Under the law of Tennessee, rescission is generally not available if the parties cannot be placed in statu quo ... In the instant case, after the erroneous value reports were filed, appellees' potential liability under the policies became an actual liability because of the fire at the Ridgely factory. Rescission of the reports would not release them from this liability but instead would increase it. As discussed above, an insured who had purchased a fixed amount of insurance could not, after his property had been destroyed, successfully seek through reformation the enlargement of his policy's limited coverage on the ground that he had intended to obtain full insurance coverage, but had failed to do so because of a clerical error made by one of his employees in determining the value of his property. See Silver Fox Co., Inc. v. New York Indemnity Co., supra. Yet appellant, although technically arguing for rescission of value reports, seeks just such relief under circumstances which would offend this principle. As the District Court stated in its first opinion:
"The facts before this Court do not involve inequitable conduct, nor is status quo restoration available. Plaintiff wishes to burden defendants with plaintiff's own inadvertence and mistake. Rescission is not available in such a case.'
"... nor in any case of which we are aware, has rescission been granted because of the unilateral mistake of one party where it would not operate to restore the positions of both parties before the mistake occurred."
(Emphasis supplied.)
Our conclusion is that we find that the defendant insurer properly used the February *30 report in determining the penalty to be imposed for undervaluation of inventory. Accordingly, the plaintiffs are not entitled to the $13,066.00 they seek.
For the reasons assigned, the judgment of the Court of Appeal affirming the judgment of the District Court is affirmed.
BARHAM, J., dissents.
NOTES
[1] Both companies were named insureds under a single policy.
[2] III. REPORTING PROVISIONS

A. PROVISIONAL AMOUNT CLAUSE: The amount of insurance provided for hereunder is provisional and is the amount on which the provisional premium is based, it being the intent of this insurance to insure hereunder the total actual cash value of the property described herein subject to the Limits of Liability for all Contributing Insurance. Any loss in excess of the limits stated in this policy shall be borne by the insured, notwithstanding the requirement that premium is to be adjusted on the basis of full values reported.
B. VALUE REPORTING CLAUSE: The insured shall report in writing to the Company, not later than 30 days after the last day of each calendar month, the exact location of all property covered and the total actual cash value of such property at each location as of the last day of each calendar month. At the time of any loss, if the insured has failed to file with the Company reports of values as above required, this policy, subject otherwise to all its terms and conditions, shall cover only at the locations and for not more than the amounts included in the last report of values filed prior to the loss, and further, if such delinquent report is the first report of values herein required to be filed, liability shall be limited to 90% of the amount for which the Company would otherwise be liable. If the inception date of this policy is the last day of the calendar month, then the first report of values due shall show the total actual cash values as of that date.
C. FULL REPORTING CLAUSE: Liability under this policy shall not in any case exceed that proportion of any loss hereunder which the last value reported prior to the loss, at the location where the loss occurs, bears to the total actual cash value at that location on the date for which such report was made. Liability for loss hereunder occurring at any location acquired since filing the last report (except as provided in the Value Reporting Clause) shall be apportioned in a like manner, except that the proportion used shall be the relation that the values reported prior to the loss at all locations bear to the total actual cash values at all locations on the date for which such report was made.
D. PREMIUM ADJUSTMENT CLAUSE: The premium named in this policy is provisional only. The actual premium consideration for the liability assumed hereunder shall be determined, at the expiration of this policy, by application of the following: 1. An average of the total values reported at each location shall be made, and if the premium on such average values at the rate applying at each location (or in the case of locations acquired, the rate used shall be the rate that is applicable to each such location at the time the location was first reported) exceeds the provisional premium, the insured shall pay to the Company the additional premium for such excess; and, if such premium is less than the provisional premium, the Company shall refund to the insured any excess paid. 2. It is a further condition of this policy, anything to the contrary notwithstanding, that the final adjusted premium as provided in this clause shall in no event be less than this policy's proportion of the minimum premium specified elsewhere in this endorsement.
(Emphasis added.)
[3] His testimony was that he prepared the March report on April 18 placed it in his out basket, and that the normal procedure was for his typist to "pick it up in the afternoon, fold the mail and distribute the copies, and place ... place them for mailing that afternoon." There was no evidence relative to this mailing other than the comptroller's testimony.
[4] It should be noted that in a prior claim (involving another loss) made by Reilly-Benton an undervaluation of inventory by Reilly-Benton was the subject of a dispute between the parties. Liberty Mutual however, had foregone its right to impose the penalty provisions involved in the policy there. We are convinced that Reilly-Benton was aware that accurately reporting the inventory was crucial for full recovery of any loss that may have occurred thereafter.
[5] "Liability under this policy should not in any case exceed that proportion of any loss hereunder which the last value reported prior to the loss, at the location where the loss occurs, bears to the total actual cash value at that location on the date for which such report was made."
[6] In fact plaintiff contends that taking the two mistakes together, there was a net overvaluation of $5,000-$7,000. While the evidence is not clear in this respect we will for our present purposes assume that plaintiff is correct in this regard.