DALTON BUICK, OLDSMOBILE, PONTIAC, CADILLAC, INC., DOING BUSINESS AS DALTON BUICK-OLDS-PONT-CAD, INC., DOING BUSINESS AS DALTON'S AUTO CENTER, APPELLEE, V. UNIVERSAL UNDERWRITERS INSURANCE COMPANY, APPELLANT.

512 N.W.2d 633

Filed March 4, 1994.    No. S-92-463.

Ronald S. Depue, of McDermott & Depue, for appellant.

Howard P. Olsen, Jr., and Robert G. Simmons, Jr., of Simmons, Olsen, Ediger & Selzer, P.C., for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, FAHRNBRUCH, and LANPHIER, JJ., and GRANT, J., Retired.

CAPORALE, J.

## I. STATEMENT OF CASE

In this contract action, the plaintiff-appellee, Dalton Buick, Oldsmobile, Pontiac, Cadillac, Inc., doing business as Dalton Buick-Olds-Pont-Cad, Inc., doing business as Dalton's Auto Center, claims the defendant-appellant, Universal Underwriters Insurance Company, failed to pay all it owed under the policy of hail insurance it had issued. The district court granted Dalton's motion for summary judgment and overruled Universal's competing motion for such judgment. Universal thereupon appealed to the Nebraska Court of Appeals, which affirmed the judgment of the district court. Universal then successfully sought further review by this court, claiming, in summary, that the intermediate court erroneously

concluded that (1) the policy was vague and ambiguous in regard to its reporting requirements and (2) Universal had received the required inventory report from Dalton in such time as to entitle the latter to full coverage. Dalton contends that it is, in any event, entitled to full coverage because (1) Universal accepted a premium after the loss, (2) the policy ambiguously defines what Universal is to pay in the event of a late report, and (3) the auditing mechanisms provided in the policy negate the accurate reporting requirement. We reverse the judgment and remand the cause to the Court of Appeals with the direction that it be remanded to the district court for the vacation of the judgment in favor of Dalton and entry of summary judgment in favor of Universal.

## II. SCOPES OF REVIEW

The procedural aspects of this matter are controlled by two rules. First, summary judgment is to be granted only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Hawkins Constr. Co. v. Reiman Corp., ante* p. 131, 511 N.W.2d 113 (1994); *VonSeggern v. Willman*, 244 Neb. 565, 508 N.W.2d 261 (1993); *Zwingman v. Kallhoff*, 244 Neb. 514, 507 N.W.2d 894 (1993). Second, although the denial of a motion for summary judgment, standing alone, is not a final order and thus may not be appealed, when adverse parties have each moved for summary judgment and the trial court sustained one of the motions, the reviewing court obtains jurisdiction over both of the motions and may determine the controversy which is the subject of those motions or may make an order specifying the facts which appear without substantial controversy and direct such further proceedings as it deems just. See *Baker's Supermarkets v. Feldman*, 243 Neb. 684, 502 N.W.2d 428 (1993). Accord *Nu-Dwarf Farms v. Stratbucker Farms*, 238 Neb. 395, 470 N.W.2d 772 (1991).

The substantive issues are controlled by the rule that construction of an insurance contract or policy is a question of

law, in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determination made by the court below. See, *Decker v. Combined Ins. Co. of Am.*, 244 Neb. 281, 505 N.W.2d 719 (1993); *Allied Mut. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 243 Neb. 779, 502 N.W.2d 484 (1993); *Polenz v. Farm Bureau Ins. Co.*, 227 Neb. 703, 419 N.W.2d 677 (1988).

## III. FACTS

Dalton operates an automobile dealership in Scottsbluff, Nebraska. Universal's policy insured a portion of Dalton's used automobile inventory for the 1991 calendar year. The policy required Dalton to report by the 15th of each month the cost of its inventory of automobiles as of the last day of the previous month and to remit within the same time period its variable monthly premium payment as calculated in the report. The monthly report and premium were to be mailed to Universal at P.O. Box 3485, Omaha, Nebraska, 68103-0485.

The pertinent language reads:

YOU [Dalton] MUST REPORT - Within 15 days after the end of each calendar month, YOU must report the cost of all AUTOS owned by or consigned to YOU as of the last business day of that month.

THE MOST WE [Universal] WILL PAY - Regardless of the number of AUTOS insured, the most WE will pay for any one LOSS to COVERED AUTOS is the least of the following:

(a) the total cost of all COVERED AUTOS;

(b) with respect to COVERED AUTOS owned by or consigned to YOU, the percentage the last report of AUTO values (received by US [Universal] prior to the LOSS) bears to the cost of all such AUTOS that YOU should have reported.

The policy also states:

PREMIUM - YOU must pay all required premiums when due, on the basis specified in the declarations:

"Variable" - each month YOU must calculate the earned premiums by multiplying the rates (shown on the required reports of values) times the values YOU report as

applicable to those rates. Together with the specific premiums shown on the report, YOU must pay US within 15 days after the end of the calendar month for which the report is to be submitted. There will be no final adjustment in the earned premium if the values reported are accurate and premiums are paid promptly when due.

The policy gives Universal the right to audit Dalton as follows:

INSPECTION AND AUDIT - WE have the right but not the duty, to inspect the insured property or operations at any time. . . .

YOU must keep accurate records and send them to US promptly upon request. WE have the right to examine and audit YOUR books and records at any time, up to three years after this policy ends.

YOU must allow US to perform any inspection or audit.

On Tuesday, May 14, 1991, Dalton mailed its inventory report as of April 30, 1991, showing an insured inventory of used automobiles totaling $701,536, together with its check for the premium due, addressed to Universal at its aforedescribed post office box. At approximately 7 p.m. central time on May 15, 1991, Dalton sustained a hail loss, which the parties agree resulted in damages of $105,550.

The U.S. Post Office "National Service Standards" provided for delivery of first-class mail from Scottsbluff to Omaha, whether to a post office box or to a street address, in 2 days; it was Universal's standard procedure to have a courier on a daily basis pick up the mail addressed to its box. After delivery of all premium checks to its depository bank, the courier delivered the mail to Universal's office, together with copies of checks deposited. Universal's courier picked up Dalton's premium check and inventory report from Universal's post office box on May 16, 1991.

In its report for the month prior to that in which the loss occurred, that is, its aforesaid report as of March 31, 1991, Dalton represented the cost of its used automobiles to be $510,436. It admits, however, that its actual cost of used automobiles not otherwise insured was approximately

$729,435.

Universal takes the position that as it did not receive the May report prior to the loss, and because Dalton had underreported its inventory as of March 31, 1991, by 30 percent, Dalton was only entitled to 70 percent of its actual loss. Accordingly, Universal paid Dalton $73,885. Dalton then sued to recover the remaining $31,665.

## IV. ANALYSIS OF UNIVERSAL'S CLAIMS

The type of insurance coverage at issue is commonly referred to as either a provisional reporting policy or a reporting form policy. 15 George J. Couch, Cyclopedia of Insurance Law § 54:91 (rev. 2d ed. 1983). According to Couch:

> A monthly reporting policy is designed to afford a complete coverage and at the same time to avoid the maintenance of insurance in excess of the value of the property insured, so that the amount of the insurance, and the amount of the premium to be paid, are in direct proportion to the value of the goods on hand. Such a policy contravenes no sound principle of law and is peculiarly adapted to those cases in which the risk is constantly changing.
>
> . . . .
>
> A provisional or monthly reporting type of fire policy . . . with a value reporting clause requiring monthly reports of the total value of the insured property and the specific insurance, and with a full reporting clause containing a formula limiting liability to the proportion of the loss which the last reported value bears to the actual value less the specific insurance, is designed to afford the owner of a business with a fluctuating inventory the privilege of adjusting his coverage to the value of the monthly inventory, with the last monthly report determining the amount of the insurance in force and the premium. It is not unreasonable to penalize the insured in this way as a consequence of its failure to timely and properly report inventory values.

*Id.* at 478-80. See *Jones Whsle. Co., Inc. v. General A. F. & L. Assur. Corp., Ltd.*, 370 F. Supp. 478 (W.D. Va. 1973), *aff'd* 508

F.2d 838 (4th Cir. 1974).

As a result of the consequences to the insured caused by underreporting the monthly value or by a late report, the full reporting clause is also referred to as an "honesty clause." *Nile Valley Coop. G. & M. Co. v. Farmers Elevator Mut. Ins. Co.*, 187 Neb. 720, 193 N.W.2d 752 (1972); *Southern Sash v. U.S. Fidelity and Guar.*, 525 So. 2d 1388 (Ala. 1988); *Standard Lumber Company v. Travelers Indemnity Co.*, 440 F.2d 544 (7th Cir. 1971).

The rationale for using and allowing the enforcement of an honesty clause in a reporting form policy was explained as follows:

> From such a method of computing the premium, it can easily be recognized that the insured, in order to save premiums, might not correctly report the true value of his inventory. During the term of a policy, an insured could mistakenly underestimate the amount of his inventory and, if there were no loss, pay a premium based on such under-estimated amounts; and if, during the term of the policy, a loss occurred, he could simply ask the court to correct the erroneous estimate that had been made. In this way, according to [the insured's] contentions, an insured could easily escape the payment of the correct amount of premiums where there was no loss; and, in the event of a loss, he could collect the full amount of his policy by offering to pay an additional amount of premiums.

*Camilla Feed Mills v. St. Paul Fire & Marine Ins. Co.*, 177 F.2d 746, 748 (5th Cir. 1949). Accord, *Standard Lumber Company, supra*; *Reilly-Benton Co. v. Liberty Mutual Insurance Corp.*, 260 So. 2d 797 (La. App. 1972), *aff'd* 278 So. 2d 24 (La. 1973); *Jones Whsle. Co., Inc., supra.*

## 1. REPORTING AND PAYMENT REQUIREMENTS

With that background in mind, we proceed to an analysis of the errors Universal has assigned, the first of which is that the Court of Appeals mistakenly concluded that the policy language with regard to reporting and payment of the premium is vague and ambiguous.

Reliance upon the "deposit-payment" rule and the

"deposit-acceptance" rule for the proposition that Universal received the report and premium when they were mailed is misplaced. The deposit-payment rule is used to avoid a forfeiture or lapse in coverage. Under that rule, where an insurer has requested or acquiesced in the sending of premiums by mail, the payment is deemed to have been made at the time it was deposited in the mail. *Tayloe v. Merchants' Fire Insurance Co.*, 50 U.S. (9 How.) 390, 13 L. Ed. 187 (1849); *Clarke v. American Concept Ins. Co.*, 758 P.2d 470 (Utah App. 1988); *American Cas. Co. of Reading v. Conn*, 741 S.W.2d 536 (Tex. Civ. App. 1987); 6 George J. Couch, Cyclopedia of Insurance Law § 31:106 (rev. 2d ed. 1985).

Our comment on the deposit-payment rule was made in *Hartford Life & Annuity Ins. Co. v. Eastman*, 54 Neb. 90, 74 N.W. 394 (1898). Therein, a check had been mailed from Omaha on December 1 to pay the insured's life insurance premium due on December 5 to the insurance company at its address in Hartford, Connecticut. Due to slow mail service, the premium check failed to reach the insurance company by December 5. After the insured died on December 26 of the same year, the insurer denied payment of benefits, taking the position that the policy had lapsed. We, however, ruled that the insurer had effectively designated the post office as the medium for making payments and held that

> [h]aving invited its patrons to use the mails in making payment of their premiums, it is but reasonable and just to infer that the company intended to accept as payment funds sent by mail in time to reach it, in due course, on or before the day such premiums would become due.

*Hartford Life & Annuity Ins. Co.*, 54 Neb. at 93, 74 N.W. at 395.

But the deposit-payment rule does not apply where, as here, the policy language clearly provides to the contrary. See, *Clarke, supra*; 6 Couch, *supra*. Here, Universal specifically provided that its coverage would be determined by the last report it had received prior to the loss.

Nor does the deposit-acceptance rule apply. That rule holds that acceptance " 'is operative and completes the contract as soon as put out of the offeree's possession . . . unless the offer

otherwise provides.' " *Panhandle Rehabilitation Center, Inc. v. Larson*, 205 Neb. 605, 608, 288 N.W.2d 743, 745 (1980). But the deposit-acceptance rule operates at the stage during which a contract is being formed; here, we are concerned with the meaning of the language of a contract which has been formed.

An insurance policy is to be construed as any other contract to give effect to the parties' intentions at the time the contract was made. When the terms of the contract are clear, they are to be accorded their plain and ordinary meaning. While an ambiguous policy will be construed in favor of the insured, an ambiguity will not be read into policy language which is plain and unambiguous in order to construe it against the preparer of the contract. *Design Data Corp. v. Maryland Cas. Co.*, 243 Neb. 945, 503 N.W.2d 552 (1993); *Economy Preferred Ins. Co. v. Mass*, 242 Neb. 842, 497 N.W.2d 6 (1993); *Thorell v. Union Ins. Co.*, 242 Neb. 57, 492 N.W.2d 879 (1992). The parties to an insurance contract may contract for any lawful coverage, and the insurer may limit its liability and impose restrictions and conditions upon its obligation under the contract not inconsistent with public policy or statute. *Design Data Corp., supra*; *Allstate Ins. Co. v. Farmers Mut. Ins. Co.*, 233 Neb. 248, 444 N.W.2d 676 (1989); *Central Waste Sys. v. Granite State Ins. Co.*, 231 Neb. 640, 437 N.W.2d 496 (1989).

We have also held that the " 'natural and obvious meaning of the provisions in a policy is to be adopted in preference to a fanciful, curious, or hidden meaning.' " *Decker v. Combined Ins. Co. of Am.*, 244 Neb. 281, 285, 505 N.W.2d 719, 722 (1993).

"Receive" is defined as meaning "to take possession or delivery of . . . to knowingly accept . . . to come into possession of : ACQUIRE . . . ." Webster's Third New International Dictionary, Unabridged 1894 (1981). "Possession" is defined as "the act or condition of having in or taking into one's control or holding at one's disposal . . . actual physical control . . . ." *Id.* at 1770. While dictionary definitions do not always control, the fact remains that the foregoing definitions contradict Dalton's contention that the report is to be deemed "received" when mailed. The policy language, which requires that the inventory report be "received by US," is not fairly susceptible to at least

two different interpretations and thus is neither vague nor ambiguous. See, *Moultrie Intern. v. Universal Underwriters Ins. Co.*, 545 F.2d 543 (5th Cir. 1977), *reh'g denied* 549 F.2d 203 (under value reporting language requiring inventory report be filed with insurer, report not effective until delivered to insurer); *Reilly-Benton Co. v. Liberty Mutual Insurance Corp.*, 260 So. 2d 797 (La. App. 1972), *aff'd* 278 So. 2d 24 (La. 1973). But see *Jones Whsle. Co., Inc. v. General A. F. & L. Assur. Corp., Ltd.*, 370 F. Supp. 478 (W.D. Va. 1973), *aff'd* 508 F.2d 838 (4th Cir. 1974).

Because the policy called for the inventory report and premium to be mailed to Universal's post office box, rather than directly to its office, Universal received the items when they were delivered to its post office box, irrespective of when its courier picked them up from the box. See, *Levy v. Massachusetts Accident Co.*, 124 N.J. Eq. 420, 2 A.2d 341 (1938); *Raidle-Cook Ins. v. Palm Beach Sanitation*, 410 So. 2d 613 (Fla. App. 1982); *Cary v. Atlantic Mut. Ins. Co.*, 30 Misc. 2d 299, 218 N.Y.S.2d 3 (1961), *rev'd on other grounds* 16 A.D.2d 867, 228 N.Y.S.2d 345 (1962).

## 2. Receipt of Report and Premium

That being so, the question remains whether, as Universal asserts in its second claim, the Court of Appeals incorrectly determined that Universal received the inventory report and premium benefit before the loss.

The evidence on the issue is that the items were mailed in Scottsbluff on May 14, 1991, when the applicable standard provided for the delivery of such mail within 2 days. It is true, as Dalton suggests, that the standard relating to the delivery of mail does not preclude earlier delivery. But Universal's courier picked up the items in Universal's box on a daily basis, and picked up Dalton's report and premium on May 16. The applicable rule is that the party moving for summary judgment has the burden to show that no genuine issue of material fact exists and must furnish sufficient evidence to demonstrate that such movant is entitled to judgment as a matter of law if the evidence presented for summary judgment remains uncontroverted. After the movant has shown facts entitling it

to judgment as a matter of law, the opposing party has the burden to present evidence showing an issue of material fact which, as a matter of law, prevents judgment for the movant. *VonSeggern v. Willman*, 244 Neb. 565, 508 N.W.2d 261 (1993); *Universal Assurors Life Ins. Co. v. Hohnstein*, 243 Neb. 359, 500 N.W.2d 811 (1993); *Ev. Luth. Soc. v. Buffalo Cty. Bd. of Equal.*, 243 Neb. 351, 500 N.W.2d 520 (1993).

Accordingly, in the absence of a showing by Dalton that its inventory report and premium payment had in fact been delivered to Universal's box sometime between the pickup on May 15 and that of the 16th, the only permissible inference is that the items were delivered to the box 2 days after Dalton mailed them and were thus received by Universal on May 16, after the loss.

## V. ANALYSIS OF DALTON'S CONTENTIONS

Having so determined, it becomes necessary to consider whether any of Dalton's contentions nonetheless preclude judgment for Universal or mandate judgment for Dalton.

### 1. ACCEPTANCE OF PREMIUM

Citing *Lipe v. World Ins. Co.*, 142 Neb. 22, 5 N.W.2d 95 (1942), Dalton argues that Universal is estopped from denying full coverage because it accepted the premium payment together with the updated inventory report.

*Lipe* declares:

> "In fact, the retention of a premium on a fire insurance policy, after knowledge of the breach of a condition involving a right to forfeiture, is an election to waive such breach and continue the policy in force, and the policy should then be construed as though such condition had never existed."

*Id.* at 28, 5 N.W.2d at 98-99.

Here, Universal did not have knowledge when it accepted the payment on May 16, 1991, of Dalton's underreporting on the March 31, 1991, report. It was not until the audit Universal undertook after cashing the premium check that it learned of the underreporting.

We conclude, as have other courts, that an insurer is not estopped by acceptance of late inventory reports and that the

liability of the insurer under a full reporting clause may not be expanded by estoppel. *Southern Sash v. U.S. Fidelity and Guar.*, 525 So. 2d 1388 (Ala. 1988); *Midwest Office Tech. v. Am. Alliance Ins.*, 437 N.W.2d 555 (Iowa 1989); *Ron Henry Ford, Lincoln, Mercury, Inc. v. Nat'l Union Fire Ins. Co.*, 8 Kan. App. 2d 766, 667 P.2d 907 (1983); *Am. Motorists Ins. v. Farrey's Wh. Hardware*, 507 So. 2d 642 (Fla. App. 1987), *review denied* 518 So. 2d 1274 (Fla.).

## 2. CONSEQUENCE OF LATENESS

Next, Dalton contends that Universal's full reporting clause is ambiguous and must therefore be construed against Universal and in favor of Dalton.

As set forth in part III above, the clause provides that the most Universal will pay is "the percentage the last report of AUTO values" received by it prior to the loss "bears to the cost of all such AUTOS" that Dalton should have reported. It ·appears from the cases cited by the parties that a more common formulation of the reporting requirement is: " 'Liability under this [policy] shall not in any case exceed . . . [t]hat proportion of any loss hereunder, which the last value reported to this Company prior to the loss bears to the actual cash value of the property . . . .' " *Moultrie Intern. v. Universal Underwriters Ins. Co.*, 545 F.2d 543, 545 (5th Cir. 1977), *reh'g denied* 549 F.2d 203.

However, to read the clause as Dalton suggests, that is, that the statement as to the most Universal will pay only creates a dollar-value cap at the $510,436 figure reported on the March 31, 1991, inventory report, would render meaningless the language limiting the payment to no more than "the total cost of all COVERED AUTOS." If the automobiles are not reported, they are not covered, so that effectively limits the liability to the $510,436 reported as of March 31. The first language referred to in the paragraph above further limits the coverage so as not to permit Dalton to receive full coverage on the partial loss of its underreported inventory.

As written, the full reporting clause is unambiguous and limits Dalton's recovery to the percentage of the loss which the reported value bears to the actual cost of inventory which

294

should have been reported.

### 3. AUDIT RIGHT

However, Dalton urges, in essence, that because of Universal's right to audit and inspect Dalton's records and the implicit right to adjust premiums in accordance with the audit, the arguments for Universal's paying less than the full amount of the loss evaporate.

We agree that the premium clause, see part III above, implies that if the values reported are not accurate, the earned premium may be adjusted. It is also true that Universal has the right to audit and inspect its insured's records. However, it is not obligated to conduct an audit and is entitled to require its insureds to in effect coinsure inventory they do not accurately report. See, *Camilla Feed Mills v. St. Paul Fire & Marine Ins. Co.*, 177 F.2d 746 (5th Cir. 1949); 15 George J. Couch, Cyclopedia of Insurance Law § 54:91 (rev. 2d ed. 1983).

### VI. JUDGMENT

For the foregoing reasons, we reverse the judgment of the Court of Appeals and remand the cause as set forth in part I above.

REVERSED AND REMANDED WITH DIRECTION.

GRANT, J., Retired, dissenting in part.

I agree with the majority's reversal of the summary judgment in favor of Dalton. I respectfully dissent from the granting of Universal's motion for summary judgment.

I agree with the majority's holding that deposit in Universal's post office box in Omaha constitutes delivery to Universal. I cannot agree that when Universal makes one pickup from the post office box in Omaha on May 15, 1991, and the next pickup is made on May 16, that it may be concluded that mail taken out of the post office box by Universal on May 16 was deposited in that post office box after 12:01 a.m. on May 16. On the present state of the record, I think there is an equally persuasive conclusion that the letter was deposited, by a U.S. mail-sorting postal clerk, into Universal's post office box by 11:59 p.m. on May 15.

It is true that affidavits state that the standard for delivery of mail is 2 days from Scottsbluff, Nebraska, to Omaha,

Nebraska. It is also true that plaintiff's affidavits show the mail in question was deposited in a mailbox in Scottsbluff between 4 and 4:30 p.m. on May 14. Universal's affidavits show that the mail for Universal was picked up on May 16 at an unstated hour, but, according to Universal's affidavits, at a sufficiently early hour to be delivered to Universal's bank and later forwarded by the bank to Universal—all of which banking and business activity must have taken place before 4 p.m. on May 16. That means the mail was delivered from Scottsbluff to Universal's post office box in Omaha in less than 48 hours. The question remains—how much before the expiration of 48 hours?

The facts concerning the time that mail was actually placed in Universal's post office box in Omaha are much more likely to be able to be proved by Universal, located in Omaha, than by Dalton, located in Scottsbluff. I would place the burden on Universal to prove that Dalton's report and check were received after 11:59 p.m. on May 15, 1991, and were thus too late for Dalton's purposes. In my judgment, that fact question is open, and neither party is entitled to summary judgment.