SINDIE KATSKEE, APPELLANT, V. BLUE CROSS/BLUE SHIELD OF NEBRASKA, APPELLEE.

515 N.W.2d 645

Filed May 6, 1994. No. S-92-1022.

Michael J. Mooney, of Gross & Welch, for appellant.

John F. Thomas and Ronald G. Fleming, of McGrath, North, Mullin & Kratz, P.C., for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, FAHRNBRUCH, and LANPHIER, JJ.

WHITE, J.

This appeal arises from a summary judgment issued by the Douglas County District Court dismissing appellant Sindie Katskee's action for breach of contract. This action concerns the determination of what constitutes an illness within the

meaning of a health insurance policy issued by appellee, Blue Cross/Blue Shield of Nebraska. We reverse the decision of the district court and remand the cause for further proceedings.

In January 1990, upon the recommendation of her gynecologist, Dr. Larry E. Roffman, appellant consulted with Dr. Henry T. Lynch regarding her family's history of breast and ovarian cancer, and particularly her health in relation to such a history. After examining appellant and investigating her family's medical history, Dr. Lynch diagnosed her as suffering from a genetic condition known as breast-ovarian carcinoma syndrome. Dr. Lynch then recommended that appellant have a total abdominal hysterectomy and bilateral salpingo-oophorectomy, which involves the removal of the uterus, the ovaries, and the fallopian tubes. Dr. Roffman concurred in Dr. Lynch's diagnosis and agreed that the recommended surgery was the most medically appropriate treatment available.

After considering the diagnosis and recommended treatment, appellant decided to have the surgery. In preparation for the surgery, appellant filed a claim with Blue Cross/Blue Shield. Both Drs. Lynch and Roffman wrote to Blue Cross/Blue Shield and explained the diagnosis and their basis for recommending the surgery. Initially, Blue Cross/Blue Shield sent a letter to appellant and indicated that it might pay for the surgery. Two weeks before the surgery, Dr. Roger Mason, the chief medical officer for Blue Cross/Blue Shield, wrote to appellant and stated that Blue Cross/Blue Shield would not cover the cost of the surgery. Nonetheless, appellant had the surgery in November 1990.

Appellant filed this action for breach of contract, seeking to recover $6,022.57 in costs associated with the surgery. Blue Cross/Blue Shield filed a motion for summary judgment. The district court granted the motion. It found that there was no genuine issue of material fact and that the policy did not cover appellant's surgery. Specifically, the court stated that (1) appellant did not suffer from cancer, and although her high-risk condition warranted the surgery, it was not covered by the policy; (2) appellant did not have a bodily illness or disease which was covered by the policy; and (3) under the terms of the

policy, Blue Cross/Blue Shield reserved the right to determine what is medically necessary. Appellant filed a notice of appeal to the Nebraska Court of Appeals, and on our motion, we removed the case to the Nebraska Supreme Court.

Appellant contends that the district court erred in finding that no genuine issue of material fact existed and granting summary judgment in favor of appellee.

Summary judgment is proper when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Dalton Buick v. Universal Underwriters Ins. Co., ante* p. 282, 512 N.W.2d 633 (1994); *Hillie v. Mutual of Omaha Ins. Co., ante* p. 219, 512 N.W.2d 358 (1994); *Healy v. Langdon, ante* p. 1, 511 N.W.2d 498 (1994); *Plambeck v. Union Pacific RR. Co.*, 244 Neb. 780, 509 N.W.2d 17 (1993). The party moving for summary judgment has the burden to show that no genuine issue of material fact exists and must produce sufficient evidence to demonstrate that the moving party is entitled to judgment as a matter of law. *Transamerica Commercial Fin. Corp. v. Rochford*, 244 Neb. 802, 509 N.W.2d 214 (1993).

In reviewing an order granting summary judgment, the appellate court views the evidence in a light most favorable to the nonmoving party and gives that party the benefit of all reasonable inferences deducible from the evidence. *Hillie, supra*; *VonSeggern v. Willman*, 244 Neb. 565, 508 N.W.2d 261 (1993).

The substantive issues raised in this appeal are governed by the rule that the interpretation and construction of an insurance contract ordinarily involve questions of law in connection with which an appellate court has an obligation to reach conclusions independent of the determinations made by the court below. *Dalton Buick, supra*; *Decker v. Combined Ins. Co. of Am.*, 244 Neb. 281, 505 N.W.2d 719 (1993); *Polenz v. Farm Bureau Ins. Co.*, 227 Neb. 703, 419 N.W.2d 677 (1988).

Blue Cross/Blue Shield contends that appellant's costs are not covered by the insurance policy. The policy provides

coverage for services which are medically necessary. The policy defines "medically necessary" as follows:

> The services, procedures, drugs, supplies or Durable Medical Equipment provided by the Physician, Hospital or other health care provider, in the diagnosis or *treatment of the Covered Person's Illness*, Injury, or Pregnancy, which are:
>
> 1. *Appropriate for the symptoms and diagnosis of the patient's Illness*, Injury or Pregnancy; and
>
> 2. Provided in the most appropriate setting and at the most appropriate level of services[;] and
>
> 3. Consistent with the standards of good medical practice in the medical community of the State of Nebraska; and
>
> 4. Not provided primarily for the convenience of any of the following:
>
> a. the Covered Person;
>
> b. the Physician;
>
> c. the Covered Person's family;
>
> d. any other person or health care provider; and
>
> 5. Not considered to be unnecessarily repetitive when performed in combination with other diagnoses or treatment procedures.
>
> We shall determine whether services provided are Medically Necessary. Services will not automatically be considered Medically Necessary because they have been ordered or provided by a Physician.

(Emphasis supplied.) Blue Cross/Blue Shield denied coverage because it concluded that appellant's condition does not constitute an illness, and thus the treatment she received was not medically necessary. Blue Cross/Blue Shield has not raised any other basis for its denial, and we therefore will limit our consideration to whether appellant's condition constituted an illness within the meaning of the policy.

The policy broadly defines "illness" as a "bodily disorder or disease." The policy does not provide definitions for either bodily disorder or disease.

An insurance policy is to be construed as any other contract to give effect to the parties' intentions at the time the contract

was made. When the terms of the contract are clear, a court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning as the ordinary or reasonable person would understand them. In such a case, a court shall seek to ascertain the intention of the parties from the plain language of the policy. *Dalton Buick v. Universal Underwriters Ins. Co., ante* p. 282, 512 N.W.2d 633 (1994); *Decker, supra*; *Dobias v. Service Life Ins. Co.*, 238 Neb. 87, 469 N.W.2d 143 (1991); *Mahoney v. Union Pacific RR. Emp. Hosp. Assn.*, 238 Neb. 531, 471 N.W.2d 438 (1991); *Brown v. Farmers Mut. Ins. Co.*, 237 Neb. 855, 468 N.W.2d 105 (1991); *Elson v. Pool*, 235 Neb. 469, 455 N.W.2d 783 (1990); *Allstate Ins. Co. v. Farmers Mut. Ins. Co.*, 233 Neb. 248, 444 N.W.2d 676 (1989); *Malerbi v. Central Reserve Life*, 225 Neb. 543, 407 N.W.2d 157 (1987). See, also, Barry R. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes § 1.01 (3d ed. 1990); 4 Samuel Williston, A Treatise on the Law of Contracts § 600 (3d ed. 1961); 43 Am. Jur. 2d *Insurance* §§ 271 and 277 (1982).

Whether a policy is ambiguous is a matter of law for the court to determine. If a court finds that the policy is ambiguous, then the court may employ rules of construction and look beyond the language of the policy to ascertain the intention of the parties. A general principle of construction, which we have applied to ambiguous insurance policies, holds that an ambiguous policy will be construed in favor of the insured. However, we will not read an ambiguity into policy language which is plain and unambiguous in order to construe it against the insurer. *Dalton Buick, supra*; *Economy Preferred Ins. Co. v. Mass*, 242 Neb. 842, 497 N.W.2d 6 (1993); *Allstate Ins. Co., supra*. See, also, Ostrager & Newman, *supra*; 4 Williston, *supra*.

When interpreting the plain meaning of the terms of an insurance policy, we have stated that the " ' "natural and obvious meaning of the provisions in a policy is to be adopted in preference to a fanciful, curious, or hidden meaning." ' " *Dalton Buick, ante* at 290, 512 N.W.2d at 640 (quoting *Decker v. Combined Ins. Co. of Am.*, 244 Neb. 281, 505 N.W.2d 719 (1993)). We have further stated that " '[w]hile for the purpose

of judicial decision dictionary definitions often are not controlling, they are at least persuasive that meanings which they do not embrace are not common.' " *Decker*, 244 Neb. at 284, 505 N.W.2d at 722 (quoting 2 George J. Couch et al., Cyclopedia of Insurance Law § 15.18 (rev. 2d ed. 1984)).

Applying these principles, our interpretation of the language of the terms employed in the policy is guided by definitions found in dictionaries, and additionally by judicial opinions rendered by other courts which have considered the meaning of these terms. Webster's Third New International Dictionary, Unabridged 648 (1981), defines disease as

> an impairment of the normal state of the living animal or plant body or of any of its components that interrupts or modifies the performance of the vital functions, being a response to environmental factors . . . to specific infective agents . . . to inherent defects of the organism (as various genetic anomalies), or to combinations of these factors : Sickness, Illness.

The same dictionary defines disorder as "a derangement of function : an abnormal physical or mental condition : Sickness, Ailment, Malady." *Id*. at 652. See, also, *Beggs v. Pacific Mutual Life Insurance Company*, 171 Ga. App. 204, 318 S.E.2d 836 (1984); Black's Law Dictionary (6th ed. 1990).

These lay definitions are consistent with the general definitions provided in Dorland's Illustrated Medical Dictionary (27th ed. 1988). Dorland's defines disease as

> any deviation from or interruption of the normal structure or function of any part, organ, or system . . . of the body that is manifested by a characteristic set of symptoms and signs and whose etiology [theory of origin or cause], pathology [origin or cause], and prognosis may be known or unknown.

*Id*. at 481. See, also, The Sloane-Dorland Annotated Medical-Legal Dictionary (1987). Dorland's defines disorder as "a derangement or abnormality of function; a morbid physical or mental state." *Id*. at 495. See, also, Sloane-Dorland, *supra*.

The Iowa Supreme Court considered the meaning of the terms "disease" and "illness" as these terms are used in insurance policies. In *Witcraft v. Sundstrand Health & Dis. Gr.*,

420 N.W.2d 785 (Iowa 1988), the Iowa Supreme Court stated that the terms "illness," "sickness," and "disease" are ordinarily synonymous in the context of an insurance policy and that these terms are defined as a " 'morbid condition of the body, a deviation from the healthy or normal condition of any of the functions or tissues of the body.' " *Id*. at 788 (quoting 45 C.J.S. *Insurance* § 893 (1946)). The Iowa court explained that because the insurance policy opted to define the terms regarding coverage by using broad language, the court would likewise consider and apply the broad and ordinary definition of these terms.

In *Cheney v. Bell National Life*, 315 Md. 761, 556 A.2d 1135 (1989), the Court of Appeals for Maryland considered whether hemophilia was a disease or sickness in the context of an exclusionary clause of an accidental death insurance policy. The insurer argued that hemophilia is not a disease because it is a genetic or hereditary condition of the body which tends to make the individual susceptible to certain diseases, but the court disagreed. The court recognized that the scientific community is not unanimous in its descriptions and characterizations of hemophilia. The court, however, stated that its interpretation of the term "disease" should be controlled by its ordinary and common meaning. Relying on definitions found in several dictionaries and reference materials, the court broadly interpreted disease to encompass an abnormal condition of such a degree that in its natural progression would be expected to be a source of trouble; a condition which has impaired, or will impair if it progresses, the working of bodily functions; a significant condition which would be commonly referred to as a disease; or an inherent defect which impairs the normal state of the body. See, *Silverstein v. Metropolitan Life Ins. Co.*, 254 N.Y. 81, 171 N.E. 914 (1930); 10 George.J. Couch, Couch on Insurance 2d § 41:389 (rev. ed. 1982); 1B John A. & Jean Appleman, Insurance Law and Practice § 391 (1981); Webster's Third New International Dictionary, Unabridged (1981). Applying the commonly accepted meaning of the term "disease," the court concluded that hemophilia is a disease as that term is used in the insurance policy. See, also, *Beggs, supra*; *Orman v. Prudential Ins. Co. of America*, 296 N.W.2d 380

(Minn. 1980) (stating that because the medical profession classifies an aneurysm as an unhealthy condition, aneurysms constitute a disease or illness within the meaning of the insurance policy); *Kitchen v. Time Insurance Co.*, 232 N.W.2d 863 (Iowa 1975) (stating that chronic alcoholism, unaccompanied by other physical or organic maladies, is considered by the medical profession to be a disease or sickness and holding that alcoholism is a sickness within the meaning of the insurance policy).

We find that the language used in the policy at issue in the present case is not reasonably susceptible of differing interpretations and thus not ambiguous. The plain and ordinary meaning of the terms "bodily disorder" and "disease," as they are used in the policy to define illness, encompasses any abnormal condition of the body or its components of such a degree that in its natural progression would be expected to be problematic; a deviation from the healthy or normal state affecting the functions or tissues of the body; an inherent defect of the body; or a morbid physical or mental state which deviates from or interrupts the normal structure or function of any part, organ, or system of the body and which is manifested by a characteristic set of symptoms and signs.

The issue then becomes whether appellant's condition—breast-ovarian carcinoma syndrome—constitutes an illness.

Blue Cross/Blue Shield argues that appellant did not suffer from an illness because she did not have cancer. Blue Cross/Blue Shield characterizes appellant's condition only as a "predisposition to an illness (cancer)" and fails to address whether the condition itself constitutes an illness. Brief for appellee at 13. This failure is traceable to Dr. Mason's denial of appellant's claim. Despite acknowledging his inexperience and lack of knowledge about this specialized area of cancer research, Dr. Mason denied appellant's claim without consulting any medical literature or research regarding breast-ovarian carcinoma syndrome. Moreover, Dr. Mason made the decision without submitting appellant's claim for consideration to a claim review committee. The only basis for

the denial was the claim filed by appellant, the letters sent by Drs. Lynch and Roffman, and the insurance policy. Despite his lack of information regarding the nature and severity of appellant's condition, Dr. Mason felt qualified to decide that appellant did not suffer from an illness.

Appellant's condition was diagnosed as breast-ovarian carcinoma syndrome. To adequately determine whether the syndrome constitutes an illness, we must first understand the nature of the syndrome.

The record on summary judgment includes the depositions of Drs. Lynch, Roffman, and Mason. In his deposition, Dr. Lynch provided a thorough discussion of this syndrome. In light of Dr. Lynch's extensive research and clinical experience in this particular area of medicine, we consider his discussion extremely helpful in our understanding of the syndrome.

According to Dr. Lynch, some forms of cancer occur on a hereditary basis. Breast and ovarian cancer are such forms of cancer which may occur on a hereditary basis. It is our understanding that the hereditary occurrence of this form of cancer is related to the genetic makeup of the woman. In this regard, the genetic deviation has conferred changes which are manifest in the individual's body and at some time become capable of being diagnosed.

At the time that he gave his deposition, Dr. Lynch explained that the state of medical research was such that detecting and diagnosing the syndrome was achieved by tracing the occurrences of hereditary cancer throughout the patient's family. Dr. Lynch stated that at the time of appellant's diagnosis, no conclusive physical test existed which would demonstrate the presence of the condition. However, Dr. Lynch stated that this area of research is progressing toward the development of a more determinative method of identifying and tracing a particular gene throughout a particular family, thus providing a physical method of diagnosing the condition.

Women diagnosed with the syndrome have at least a 50-percent chance of developing breast and/or ovarian cancer, whereas unaffected women have only a 1.4-percent risk of developing breast or ovarian cancer. In addition to the genetic deviation, the family history, and the significant risks

associated with this condition, the diagnosis also may encompass symptoms of anxiety and stress, which some women experience because of their knowledge of the substantial likelihood of developing cancer.

The procedures for detecting the onset of ovarian cancer are ineffective. Generally, by the time ovarian cancer is capable of being detected, it has already developed to a very advanced stage, making treatment relatively unsuccessful. Drs. Lynch and Roffman agreed that the standard of care for treating women with breast carcinoma syndrome ordinarily involves surveillance methods. However, for women at an inordinately high risk for ovarian cancer, such as appellant, the standard of care may require radical surgery which involves the removal of the uterus, ovaries, and fallopian tubes.

Dr. Lynch explained that the surgery is labeled "prophylactic" and that the surgery is prophylactic as to the prevention of the onset of cancer. Dr. Lynch also stated that appellant's condition itself is the result of a genetic deviation from the normal, healthy state and that the recommended surgery treats that condition by eliminating or significantly reducing the presence of the condition and its likely development.

Blue Cross/Blue Shield has not proffered any evidence disputing the premise that the origin of this condition is in the genetic makeup of the individual and that in its natural development it is likely to produce devastating results. Although handicapped by his limited knowledge of the syndrome, Dr. Mason did not dispute the nature of the syndrome as explained by Dr. Lynch and supported by Dr. Roffman, nor did Dr. Mason dispute the fact that the surgery falls within the standard of care for many women afflicted with this syndrome.

In light of the plain and ordinary meaning of the terms "illness," "bodily disorder," and "disease," we find that appellant's condition constitutes an illness within the meaning of the policy. Appellant's condition is a deviation from what is considered a normal, healthy physical state or structure. The abnormality or deviation from a normal state arises, in part, from the genetic makeup of the woman. The existence of this

unhealthy state results in the woman's being at substantial risk of developing cancer. The recommended surgery is intended to correct that morbid state by reducing or eliminating that risk.

Although appellant's condition was not detectable by physical evidence or a physical examination, it does not necessarily follow that appellant does not suffer from an illness. The record establishes that a woman who suffers from breast-ovarian carcinoma syndrome does have a physical state which significantly deviates from the physical state of a normal, healthy woman. Specifically, appellant suffered from a different or abnormal genetic constitution which, when combined with a particular family history of hereditary cancer, significantly increases the risk of a devastating outcome.

We are mindful that not every condition which itself constitutes a predisposition to another illness is necessarily an illness within the meaning of an insurance policy. There exists a fine distinction between such conditions, which was recognized by Chief Justice Cardozo in *Silverstein v. Metropolitan Life Ins. Co.*, 254 N.Y. 81, 171 N.E. 914 (1930). Writing for the court, Chief Justice Cardozo explained that when a condition is such that in its probable and natural progression it may be expected to be a source of mischief, it may reasonably be described as a disease or an illness. On the other hand, he stated that if the condition is abnormal when tested by a standard of perfection, but so remote in its potential mischief that common speech would not label it a disease or infirmity, such a condition is at most a predisposing tendency. The *Silverstein* court found that a pea-size ulcer, which was located at the site of damage caused by a severe blow to the deceased's stomach, was not a disease or infirmity within the meaning of an exclusionary clause of an accident insurance policy because if left unattended, the ulcer would have been only as harmful as a tiny scratch.

Blue Cross/Blue Shield relies upon our decision in *Fuglsang v. Blue Cross*, 235 Neb. 552, 456 N.W.2d 281 (1990), and contends that we have already supplied a definition for the terms "disease," "condition," and "illness." Although we find that reliance on *Fuglsang* is somewhat misplaced, the opinion is relevant to our determination of the meaning of "disease,"

"illness," and "disorder," and whether the condition from which appellant suffered constitutes an illness.

The issue raised in *Fuglsang* was whether the disease from which the plaintiff suffered constituted a preexisting condition which was excluded from coverage by the terms of the policy. Blue Cross/Blue Shield relies on the following rule from *Fuglsang* as a definition of "disease":

> A disease, condition, or illness exists within the meaning of a health insurance policy excluding preexisting conditions only at such time as the disease, condition, or illness is manifest or active or when there is a distinct symptom or condition from which one learned in medicine can with reasonable accuracy diagnose the disease.

*Id.* at 557-58, 456 N.W.2d at 284.

This statement concerns *when* an illness exists, not whether the condition itself is an illness. If the condition is not a disease or illness, it would be unnecessary to apply the above rule to determine whether the condition was a preexisting illness. In the present case, Blue Cross/Blue Shield maintains that the condition is not even an illness.

Even assuming arguendo that the rule announced in *Fuglsang* is a definition of "disease," "illness," and "condition," the inherent problems with the argument put forth by Blue Cross/Blue Shield undermine its reliance on that rule. Blue Cross/Blue Shield emphasizes the fact that appellant was never diagnosed with cancer and therefore, according to Blue Cross/Blue Shield, appellant did not have an illness because cancer was not active or manifest. Appellant concedes that she did not have cancer prior to her surgery. The issue is whether the condition she did have was an illness. Blue Cross/Blue Shield further argues that "[n]o disease or illness is 'manifest or active' and there is no 'distinct symptom or condition' from which Dr. Lynch or Dr. Roffman could diagnose a disease." Brief for appellee at 13. We stated above that lack of a physical test to detect the presence of an illness does not necessarily indicate that the person does not have an illness.

When the condition at issue—breast-ovarian carcinoma

syndrome—is inserted into the formula provided by the *Fuglsang* rule, the condition would constitute an "illness" as Blue Cross/Blue Shield defines the term. The formula is whether the breast-ovarian carcinoma syndrome was manifest or active, or whether there was a distinct symptom or condition from which one learned in medicine could with reasonable accuracy diagnose the disease. The record establishes that the syndrome was manifest, at least in part, from the genetic deviation, and evident from the family medical history. The condition was such that one learned in medicine, Dr. Lynch, could with a reasonable degree of accuracy diagnose it. Blue Cross/Blue Shield does not dispute the nature of the syndrome, the method of diagnosis, or the accuracy of the diagnosis.

In the present case, the medical evidence regarding the nature of breast-ovarian carcinoma syndrome persuades us that appellant suffered from a bodily disorder or disease and, thus, suffered from an illness as defined by the insurance policy. Blue Cross/Blue Shield, therefore, is not entitled to judgment as a matter of law. Moreover, we find that appellant's condition did constitute an illness within the meaning of the policy. We reverse the decision of the district court and remand the cause for further proceedings. See *Design Data Corp. v. Maryland Cas. Co.*, 243 Neb. 945, 503 N.W.2d 552 (1993).

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.

WRIGHT, J., participating on briefs.