DESIGN DATA CORPORTION, APPELLEE, V. MARYLAND CASUALTY
COMPANY, AN INSURANCE COMPANY, DEFENDANT AND THIRD-PARTY
PLAINTIFF, APPELLANT, CONSOLIDATED FREIGHTWAYS, INC.,
THIRD-PARTY DEFENDANT, APPELLEE.
503 N.W.2d 552

Filed August 6, 1993.    No. S-91-579.

Stephen L. Ahl and Michael A. England, of Wolfe, Anderson, Hurd, Luers & Ahl, for appellant.

Lavern R. Holdeman, of Nelson Morris Holdeman & Titus, for appellee Design Data Corp.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, FAHRNBRUCH, and LANPHIER, JJ.

HASTINGS, C.J.

This action was brought by the insured, Design Data Corporation, upon the denial of a claim made on a commercial insurance policy issued by defendant and third-party plaintiff Maryland Casualty Company. Design Data sought the recovery of damages to a computer plotter shipped by third-party defendant Consolidated Freightways, Inc., from the insured to a customer, HHB Drafting, Inc.

Summary judgment was entered in favor of Design Data and against Maryland Casualty, as later will be set out. There is no issue remaining to be decided between Maryland Casualty as third-party plaintiff and Consolidated as third-party defendant.

A summary judgment is proper when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences to be drawn therefrom and that the moving party is entitled to judgment as a matter of law. *In re Estate of Wells, ante* p. 152, 497 N.W.2d 683 (1993); *Viking Broadcasting Corp. v. Snell Publishing Co., ante* p. 92,

497 N.W.2d 383 (1993).

In reviewing an order sustaining a motion for summary judgment, an appellate court views the evidence in a light most favorable to the party opposing the motion and gives that party the benefit of all reasonable inferences that may be deduced from the evidence. *Professional Firefighters of Omaha v. City of Omaha, ante* p. 166, 498 N.W.2d 325 (1993); *Economy Preferred Ins. Co. v. Mass*, 242 Neb. 842, 497 N.W.2d 6 (1993).

Design Data operates a computer services company in Lincoln, Nebraska. Design Data purchased from Maryland Casualty a policy of commercial insurance for its operations which was in effect at the time of the loss at issue here. In relevant part, the policy provides:

**Property Insured**

. . . .

We'll cover equipment you own, rent, or for which you are legally responsible. We'll consider all of these to be yours in this agreement.

. . . .

**Where Insurance Applies**

We'll cover losses that occur at the locations shown in the Declarations, or while in transit in the United States of America excluding Hawaii and Alaska.

**Causes of Loss Insured**

. . . .

We'll cover losses that occur at the locations shown in the Declarations, up to the limit of coverage that applies. Losses that occur while property is in transit are covered up to the transit limit. If no transit limit is shown, these losses won't be covered.

The schedule of covered premises in the "Declarations" shows the address of the location as 1033 O Street, Lincoln, NE 68508. The limits of insurance in the "Declarations" disclose: "G. Property in Transit $_____."

In November 1988, Design Data sold a "Hewlett Packard 7586B Roll-Feed 8-Pen Drafting Plotter," as part of a structural steel design computer system, to HHB. Design Data arranged for shipment to the purchaser in Pevely, Missouri, via Consolidated. In a deposition, Design Data's vice president of

sales, Ed Bruening, stated that the plotter was in good condition when tendered to Consolidated and that the carton it was packaged in showed no evidence of damage or perforation. However, HHB employee Harold Glamann, who received the shipment, testified by deposition that when the plotter arrived, he noticed that there had been some damage to the cardboard container. Glamann stated: "The wheels of the plotter were actually protruding through a hole in the container. When the driver drug [sic] it off or dropped it to the ground, that may or may not have created more damage. It dropped rougher than I would like to see computer equipment handled." When Glamann was asked if there was any other noticeable damage to the carton, he replied that it appeared that "something had either fallen on it or something heavy put on it that it was caved in." Upon opening the carton and examining the plotter, Glamann noticed that it had been "cracked and chipped in a couple of different places" and that the paper tray was bent or not positioned properly.

Howard Becker, president of HHB, stated in a deposition that at the time he learned of the damage to the plotter upon his return to his plant, a Design Data representative was present. Becker testified that the individual from Design Data hooked up the plotter and "tried to get it to work," but that it just made a loud noise and was not operable. The plotter had been tendered to Consolidated pursuant to a tariff provision which set the "released value" for the computer equipment at $5 per pound. As a result of the damage, Design Data filed a claim with Consolidated, which issued a draft to Design Data on March 29, 1989, for $1,700, the tariff limit as specified. The reverse side of the draft, which was accepted and endorsed by Design Data, contained the following language:

> Endorsement and negotiation of this draft constitutes a release of *all claims*, known or unknown, including judgments thereon, the undersigned has or may have against the payor, and *any other person* on account of any injury, loss or damage, arising out of, or in connection with, the occurrence referred to on the explanatory voucher slip attached hereto.

(Emphasis supplied.)

In a letter to Design Data dated February 21, 1989, Maryland Casualty acknowledged the receipt of a loss notice regarding the damaged plotter and stated:

> It is our position that Design Data Inc. no longer owned the equipment purchased and accepted by HHB Drafting Inc. Therefore, your Electronic Data Processing form would not cover any equipment since you did not own[,] rent or have legal responsibility for same. We must respectfully deny coverage on this claim.

In its amended answer, Maryland Casualty alleged that Design Data had delivered the computer to the purchaser, which had accepted the goods; that the property was damaged while in transit; and that the property was covered by a transit limit calculated at the released value rate of $5 per pound. It was additionally alleged that there had been a settlement of all claims which arose from the damage in that a check for $1,700 was issued to Design Data from Consolidated. Maryland Casualty generally denied all other allegations of Design Data's petition. Design Data moved to strike portions of the amended answer dealing with the transit limit, asserting that Maryland Casualty was estopped from raising new and different allegations in defense of denial of coverage. In a journal entry dated October 24, 1990, the district court sustained Design Data's motion to strike and granted Design Data's motion for summary judgment, as previously indicated. The court later entered judgment for the amount of damage which it found due. The parties had stipulated that the remaining value of the damaged plotter after crediting the payment of $1,700 made by Consolidated was $10,112.88. It was in this amount that the court entered judgment for Design Data, plus attorney fees of $6,961.80.

Maryland Casualty first contends that the district court erred in finding that Design Data had an insurable interest in the plotter at the time the damage was discovered. The initial question to be resolved is whether the Nebraska Uniform Commercial Code is applicable to the transaction at issue. Design Data argues that the transaction was not governed by the provisions of the Uniform Commercial Code because it was primarily for the performance of services and not for the sale of

goods.

The president of HHB, Becker, testified that from his discussions with Design Data, he was under the impression that he was purchasing a complete system for the price of $73,495, which included the hardware and software that worked together, a license to use the software, a 3-day training seminar in Lincoln, and installation of the software and hardware at his office. Becker stated that he would not have purchased the hardware from Design Data apart from the system, because although he could have purchased the same hardware locally, a condition of the sale was the purchase of the hardware and software as a bundled unit, and the software was the most important part of the system. Both hardware and software would be considered "goods."

In *Mennonite Deaconess Home & Hosp. v. Gates Eng'g Co.*, 219 Neb. 303, 307-08, 363 N.W.2d 155, 160 (1985), this court discussed the applicability of the Uniform Commercial Code when a contract calls for both the sale of goods and the rendition of services, noting:

> The question of whether this is a contract for the sale of goods depends upon an examination of the entire contract. The cases are uniform in holding that the U.C.C. applies where the principal purpose of the contract is the sale of goods, even though in order for the goods to be utilized, some installation is required. On the other hand, if the contract is principally for services and the goods are merely incidental to the contract, the provisions of the U.C.C. do not apply.
>
> The test for inclusion in or exclusion from the sales provisions is not whether the contracts are mixed but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved, or whether they are transactions of sale, with labor incidentally involved.

While Becker stated that he would not have purchased the hardware apart from the system as a whole, it is evident from his testimony that the hardware and software, sold as a bundled unit, were the essential elements of the sale, and not the

installation or other peripheral items, such as the 3 days of training, which were included in the purchase price. Becker also testified that "[w]e had made arrangements for Design Data's representative to be here [at HHB's plant] on a Sunday to install this so that we could productively start using it on a Monday." It would seem apparent that installation required no more than a relatively short time to hook up the $73,495 system and test it. Thus, the sale of goods was the predominant factor in the transaction, with labor incidentally involved, and the provisions of the Uniform Commercial Code therefore apply.

Maryland Casualty contends that under Neb. U.C.C. § 2-509 (Reissue 1992), the risk of loss had passed to the buyer upon the buyer's acceptance of the plotter and that Design Data had no insurable interest at the time the damage was discovered. In pertinent part, § 2-509 provides:

> (1) Where the contract requires or authorizes the seller to ship the goods by carrier . . .
>
> (b) if it does require him to deliver them at a particular destination and the goods are there duly tendered while in the possession of the carrier, the risk of loss passes to the buyer when the goods are there duly so tendered as to enable the buyer to take delivery.

Maryland Casualty concedes that the risk of loss can be shifted back to the seller if the buyer effectively revokes acceptance, but contends that the key criterion is whether the buyer's acceptance was reasonably induced by the difficulty of discovery of nonconformity before acceptance. Neb. U.C.C. § 2-608 (Reissue 1992) provides:

> (1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it
>
> (a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or
>
> (b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.
>
> (2) Revocation of acceptance must occur within a

reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

Neb. U.C.C. § 2-510 (Reissue 1992) deals with the effect of a breach on the risk of loss, stating in pertinent part:

(1) Where a tender or delivery of goods so fails to conform to the contract as to give a right of rejection the risk of their loss remains on the seller until cure or acceptance.

(2) Where the buyer rightfully revokes acceptance he may to the extent of any deficiency in his effective insurance coverage treat the risk of loss as having rested on the seller from the beginning.

In addition to the above, Neb. U.C.C. § 2-501 (Reissue 1992) provides in part:

(2) The seller retains an insurable interest in goods so long as title to or any security interest in the goods remains in him and where the identification is by the seller alone he may until default or insolvency or notification to the buyer that the identification is final substitute other goods for those identified.

Maryland Casualty argues that HHB's rejection was untimely and, thus, an ineffective transfer of the risk of loss, since the buyer's onsite manager had reason to suspect that the plotter had been damaged when the shipment arrived. Although HHB employee Glamann noticed that the container was damaged when the shipment arrived, he testified that at the time he signed the delivery receipt, the plotter was still in the box and he did not know that there was any physical damage to the plotter. After he discovered the damage he reported it to his supervisor, Becker, when Becker returned to the office.

Becker testified that he had been in Lincoln for a training session with Design Data and learned of the damage to the plotter upon his return to the office on Sunday. As we have

previously stated, Becker said that he had made arrangements for a Design Data representative to be at HHB's plant on Sunday to install the equipment so that it could be used on Monday. Becker and the Design Data representative learned of the damage to the plotter at approximately the same time. Becker stated that the Design Data representative was to return to Lincoln on Monday morning and report the damage to his supervisor and would send another plotter to HHB as soon as possible. Becker further testified that he was to pay the balance due on the equipment after it was installed in his office, but that he withheld payment that day because the system was not working.

While HHB had reason to suspect that the plotter was damaged, the nature of the damage was not known until the carton was opened and inspection was made. It was reasonable under the circumstances for Becker to allow the Design Data representative who was present to install the plotter to ascertain the extent of the damage. The revocation of acceptance was timely, and thus, the risk of loss remained with the seller, Design Data. Under the terms of its policy, Maryland Casualty was to provide coverage for equipment which Design Data owned, rented, or for which it was legally responsible. Design Data had an insurable interest in the plotter at the time the damage was discovered, and therefore Maryland Casualty's first assignment of error is without merit.

Maryland Casualty next asserts that the district court erred in finding that Maryland Casualty's liability was not limited to the transit limit in effect at the time that the plotter was damaged and in finding that Design Data had not waived all claims against Maryland Casualty when it executed a release of claims in exchange for settlement with Consolidated.

In regard to the claimed error regarding the transit limit, relying on *Boren v. State Farm Mut. Auto. Ins. Co.*, 225 Neb. 503, 406 N.W.2d 640 (1987), and *Mutual Benefit Life Ins. Co. v. Chisholm*, 213 Neb. 301, 329 N.W.2d 103 (1983), Design Data asserts the rule that in order for an insurer to claim a particular reason for denying liability, it must do so prior to the filing of litigation; i.e., after having given a reason for denial of coverage, it cannot later, when suit is filed, rely on a separate

and different reason. Here, Design Data contends that the only information it possessed concerning the declination of the claim was contained in a letter from a Maryland Casualty representative which relied upon the purported passing of title or ownership of the equipment to HHB.

*Boren* and *Chisholm* are examples of what has sometimes been called "mending one's hold" once litigation begins. This rule, found in Nebraska case law, was based originally on *Railway Co. v. McCarthy*, 96 U.S. 258, 24 L. Ed. 693 (1877). That case involved a claim for damage to cattle shipped by rail from Parkersburg, West Virginia, which failed to reach Baltimore on a Monday because the shipper, it was first claimed, could not obtain the necessary cars. After suit was filed, the defendant claimed that Parkersburg's "Sunday Laws" prevented such activities as shipping cattle on Sunday. The Supreme Court rejected the defense on the ground that the defendant was "mending its hold."

> We have already shown that the defendant proved upon the trial that it was impossible to forward the cattle on Sunday, for want of cars. And it is fairly to be presumed that no other reason was given for the refusal at that time. It does not appear that any thing was then said as to the illegality of such a shipment on the Sabbath. This point was an after-thought, suggested by the pressure and exigencies of the case.

96 U.S. at 267. Insurance or extension of coverage was not involved in this case.

Out of that beginning has grown the concept of coverage by estoppel at least tangentially referred to in *Chisholm*. In *Chisholm*, Justice Caporale, who was joined in his concurring opinion by Justices Boslaugh and McCown, pointed out:

> My misgiving arises from the confusion which appears to surround the restated rule that once an insurer gives a reason for its conduct and decision, it cannot, after litigation has begun, change its ground and its conduct upon another and different consideration. The cases cited by the majority certainly establish that the rule exists and has been applied in insurance cases. Indeed, the rule has been applied in certain noninsurance cases as, for

example, situations in which no objective evidence of some later asserted reason existed. [Citations omitted.]

I respectfully suggest, however, that such a rule makes no sense in the absence of showing detrimental reliance upon the prior statements or conduct. The rule, after all, is one of estoppel. Estoppel ordinarily requires as one of its elements proof that the party asserting the doctrine has been prejudiced by good faith reliance upon the statements or conduct of the other party. [Citations omitted.] I would make clear that, as an element of the rule, good faith detrimental reliance upon an insurer's prior statements or conduct must be shown.

213 Neb. at 309, 329 N.W.2d at 107.

Both parties seem to misconstrue the policy provisions as to losses occurring "in transit." The relevant policy language bears repeating here: "[L]osses that occur while property is in transit are covered up to the transit limit. If no transit limit is shown, these losses won't be covered." The substance of Maryland Casualty's argument has to be that the "transit limit" in the policy refers to the "released value rate" contained in the tariff. This position makes no sense. The application of "transit limit" must be found within the policy. The plain reading of the policy discloses that the amount of transit limit has been left blank in the policy. No transit limit is shown in the policy, and therefore under the terms of the policy, "these losses won't be covered."

An insurance policy is to be construed as any other contract to give effect to the parties' intentions at the time the contract was made. When the terms of the contract are clear, they are to be accorded their plain and ordinary meaning. While an ambiguous policy will be construed in favor of the insured, an ambiguity will not be read into policy language which is plain and unambiguous in order to construe it against the preparer of the contract. *Economy Preferred Ins. Co. v. Mass*, 242 Neb. 842, 497 N.W.2d 6 (1993); *Thorell v. Union Ins. Co.*, 242 Neb. 57, 492 N.W.2d 879 (1992). The parties to an insurance contract may contract for any lawful coverage, and the insurer may limit its liability and impose restrictions and conditions upon its obligation under the contract not inconsistent with public policy or statute. *Allstate Ins. Co. v. Farmers Mut. Ins. Co.*,

233 Neb. 248, 444 N.W.2d 676 (1989); *Central Waste Sys. v. Granite State Ins. Co.*, 231 Neb. 640, 437 N.W.2d 496 (1989).

The parties in this case simply did not contract for any transit coverage, nor was any premium paid for this coverage. In limiting the expansion of coverage by waiver and estoppel, the Michigan Court of Appeals, in *Lee v Evergreen Regency Coop*, 151 Mich. App. 281, 285-86, 390 N.W.2d 183, 185-86 (1986), stated in part:

[A]s .noted in 1 ALR3d 1139, 1144; "[T]he courts of most jurisdictions agree that [waiver and estoppel] are not available to broaden the coverage of a policy so as to protect the insured against risks not included therein or expressly excluded therefrom. The theory underlying this rule seems to be that the company should not be required by waiver and estoppel to pay a loss for which it charged no premium, and the principle has been announced in scores of cases involving almost every conceivable type of policy or coverage provision thereof."

As pointed out in *ABCD...Vision v. Fireman's Fund Ins. Companies*, 304 Or. 301, 306-07, 744 P.2d 998, 1001-02 (1987), by the Oregon Supreme Court:

The Court of Appeals misapplied this court's decision in *Ward* [*v. Queen City Ins. Co.*, 69 Or. 347, 128 P. 1067 (1914),] because, in doing so, it ignored the distinction between the applicability of estoppel to conditions of forfeiture and its applicability to exclusions relating to the scope of coverage.

. . . .

. . . When an insurer's assertion of policy defenses is challenged by claiming that policy exclusions have been lost through estoppel, the correct procedure is to determine first whether the provisions upon which the insurer relies are conditions of forfeiture that are subject to estoppel or, instead, are matters relating to the scope of coverage. Estoppel cannot be invoked to expand insurance coverage or the scope of an insurance contract. . . .

When there is forfeiture of coverage being effected, there is insurance coverage for the loss in the first place,

but acts of the insured nullify the coverage, such as the filing of a false statement of loss in *Ward*. Here, there never was coverage under provision (a) of the policy for "mechanical or electrical breakdown or failure" of the insured property. Under provision (a) these perils were outside the scope of the coverage. Further, under provision (g) there never was coverage for "[l]oss, damage * * * resulting from repairing, adjusting, servicing or maintenance operation" of the insured. Nothing in the estoppel doctrine of *Ward* prevents the insurer from adding these additional defenses against coverage of this loss.

Estoppel may not be used to expand the scope of coverage of a policy to include coverage not provided for in the contract or excluded by the contract. *Shannon v. Shannon*, 150 Wis. 2d 434, 442 N.W.2d 25 (1989).

In *State Farm Mut. Auto. v. Hartford Acc. & Ind.*, 646 S.W.2d 379, 381 (Mo. App. 1983), the court stated, " 'The point urged by appellant is one of coverage, and the law is firmly established that extension of coverage beyond the plain wording of the contract cannot result from waiver.' "

"The trial court was correct in its refusal to expand the coverage in excess of the stated limits of an unambiguous insurance contract. The doctrine of estoppel may not be used to enlarge the coverage of an insurance policy." *Shannon v. Great American Ins. Co.*, 276 N.W.2d 77, 78 (Minn. 1979).

While the rule as to "mending one's hold" *may* be alive and well as to conditions of forfeiture, generally it has no application to matters relating to coverage, and estoppel cannot be invoked to expand the scope of coverage of an insurance contract absent a showing of detrimental good faith reliance upon statements or conduct of the party against whom estoppel is invoked which reasonably led an insured to believe coverage was present. In *Boren v. State Farm Mut. Auto. Ins. Co.*, 225 Neb. 503, 406 N.W.2d 640 (1987), apparently the insurance company had furnished a defense to the insured all the way through judgment without a reservation of rights. It was not until the insurance company answered interrogatories in garnishment that it claimed that the people whom it had

defended as insureds were not insureds as defined in the policy. This case is not applicable to the present situation.

As to *Mutual Benefit Life Ins. Co. v. Chisholm*, 213 Neb. 301, 329 N.W.2d 103 (1983), to the extent that it may suggest that coverage on an insurance policy may be extended by estoppel without a showing of detrimental reliance, it is disapproved.

It should now be apparent that Design Data's problem is that it never had "in transit" coverage; it has only vaguely alleged, but failed to establish, that its loss came within the terms of the Maryland Casualty policy. When a breach of an insurance contract is alleged, the plaintiff has the burden of bringing his or her claim within the limitations of the policy. *Craig v. Farmers Mut. Ins. Co.*, 239 Neb. 271, 476 N.W.2d 529 (1991).

The problem now shifts to Maryland Casualty. Although it does not claim error in the obvious finding by the trial court that coverage was present, it did in its amended answer generally deny "each and every other allegation of Plaintiff's Petition," placing in issue Design Data's claim that its loss was within the coverage of the policy. In the case *In re Interest of D.M.B.*, 240 Neb. 349, 351, 481 N.W.2d 905, 908-09 (1992), we said:

> Although an appellate court does not consider assignments of error not listed and discussed in the briefs, it always reserves the right to note plain error which was not complained of at trial or on appeal but is plainly evident from the record, and which is of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. . . . *Canas v. Maryland Cas. Co.*, 236 Neb. 164, 459 N.W.2d 533 (1990).

We determine that the trial court, in implicitly finding that this particular loss was within the coverage of the insurance policy, committed plain error and that Design Data is not entitled to summary judgment. However, Maryland Casualty filed no corresponding motion for summary judgment, so it is necessary that we remand the cause to the district court for further proceedings. See *Baker's Supermarkets v. Feldman*, *ante* p. 684, 502 N.W.2d 428 (1993). Because we reverse the

judgment, it is unnecessary for us to consider Maryland Casualty's final assignment of error.

The judgment of the district court is reversed, and the cause is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.