KIEWIT DIVERSIFIED GROUP INC., Plaintiff,

v.

FEDERAL INSURANCE COMPANY
and Pacific Insurance Company,
Defendants.

No. 96 C 5346.

United States District Court,
N.D. Illinois,
Eastern Division.

March 31, 1998.

Chaim T. Kiffel, S. Jonathan Silverman, Kirkland & Ellis, Chicago, IL, for Kiewit Diversified Group, Inc., Plaintiff.

David J. Hensler, Jonathan A. Constine, Hogan & Hartson, Washington, DC, Royal B. Martin, Jr., Leigh David Roadman, William Kevin Kane, Martin, Brown & Sullivan, Ltd., Chicago, IL, for Federal Insurance Company, Defendant.

William Michael Monat, David L. Koury, Anne Fiedler, Peterson & Ross, Chicago, IL, for Pacific Insurance Company, Defendant.

## MEMORANDUM OPINION AND ORDER

LINDBERG, District Judge.

This diversity action results from a previous lawsuit filed against plaintiff, Kiewit Di-

versified Group Inc. (Kiewit), its subsidiary MFS Communications Co., and one of its directors for violation of securities laws, fraud and breach of fiduciary duty. That lawsuit concluded when Kiewit agreed to pay an $11.8 million settlement. Kiewit now seeks reimbursement under its two directors and officers liability insurance policies for the costs of settlement and legal defense in that underlying case, which together amount to at least $14 million. Jurisdiction exists as all parties are diverse and the amount in controversy exceeds $50,000.[1]

## I. Statement of Facts

Defendant Federal Insurance Co. issued the executive protection insurance policy at issue to Peter Kiewit Sons' Inc. (Kiewit's parent company). It took effect January 12, 1994, and covered Peter Kiewit, its subsidiaries and their duly elected or appointed directors and officers. The policy limit was $10 million, which applied after a $2.5 million deductible was met. The policy stated that Federal would:

> pay on behalf of the insured organization all loss for which the insured organization grants indemnification to each insured person, as permitted or required by law, which the insured person has become legally obligated to pay on account of any claim first made against him, individually or otherwise, during the policy period ... for a wrongful act committed, attempted, or allegedly committed or attempted by such insured person before or during the policy period.

The term "insured organization" as defined in the policy included Peter Kiewit and its direct and indirect subsidiaries, and "insured person" included "any person who has been, now is, or shall become a duly elected director or a duly elected or appointed officer of the Insured Organization." The term "insured" included "the insured organization and any insured person." A "claim" was defined as: a "civil proceeding commenced by the service of a complaint or similar pleading ... against any insured person" and "loss" as "the total amount which any insured person becomes legally obligated to pay on

account of each claim ... for which coverage applies, including but not limited to, damages, judgments, settlements, costs and defense costs." "Wrongful act" was "any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted, by an Insured Person."

The policy included an allocation provision that stated: "(i)f both loss covered by this coverage section and loss not covered by this coverage section are incurred, either because a claim against the insured person included both covered and uncovered matters or because a claim is made against both an insured person and others ... the insured and the company shall use their best efforts to agree upon a fair and proper allocation of such amount between covered loss and uncovered loss."

Certain instances of loss were not covered under the policy. For instance, the "insured v. insured" exclusion stated:

> [Federal] shall not be liable for Loss on account of any claim made against any insured person:
>
> . . .
>
> (c) brought or maintained by or on behalf of any insured except:
>
>> (i) a claim that is a derivative action brought or maintained on behalf of an insured organization by one or more persons who are not insured persons and who bring and maintain the claim without the solicitation, assistance or participation of any insured,
>>
>> (ii) a claim brought or maintained by an insured person for the actual or alleged wrongful termination of the insured person, or
>>
>> (iii) a claim brought or maintained by an insured person for contribution or indemnity, if the claim directly results from another claim covered under this coverage section.

The policy contained a "Nebraska Amendatory Endorsement," which is required under Nebraska law for policies issued for delivery

---

**1.** Kiewit is a Delaware corporation with its principal place of business in Nebraska; Federal Insurance Co. is a corporation organized in Indiana with its principal place of business in Indiana; and Pacific is organized in California with its principal place of business in Chicago.

in Nebraska. Defendant Pacific Insurance Co. provided an excess coverage policy, which applied once Kiewit reached the limits of the primary policy. This secondary policy provided an additional $10 million in coverage for any loss that was covered under the primary policy.

In 1988, Kiewit formed a subsidiary, Kiewit Communications Co., which eventually became MFS Communications Corp. (MFSCC), to pursue business opportunities in the telecommunications industry and to provide businesses with an alternative source of local telecommunications services. In June 1989, MFSCC increased to 80% its ownership interest in Metropolitan Fiber Systems, Inc. (MFS Telecom), a company that managed an alternate local communications network in Chicago. James Crowe, CEO of MFSCC; Royce Holland, president and chief operating officer; and Terrence Ferguson, general counsel; were the MFSCC executives primarily involved in these negotiations, with Crowe acting as the lead negotiator. The original owners of the company—Arthur Brantman, Anthony Pompliano, Howard Gimbel and David Husman—retained the remaining 20% of the shares in MFS Telecom. In August 1990, the 20% interest was further divided so that 10 individuals held the shares.

Several of the minority shareholders approached Crowe in late 1991 regarding the sale of their shares to MFSCC. Only Anthony Pompliano completed the deal at this time, selling for $85,000 per share in June 1992. In July 1992, negotiations renewed with the remaining minority shareholders, leading to MFSCC's purchase of the remainder of the minority shares for $135,000 per share. MFSCC paid Pompliano an additional $50, 000 per share to equalize his sale price with that of the other minority shareholders.

In May 1993, MFSCC sold 20% of its stock through an initial public offering. As a result, six of the minority shareholders brought an action in March 1994 in the Northern District of Illinois against Crowe, MFSCC and Kiewit. The four-count complaint contained allegations of violations of federal securities laws, fraud, breach of fiduciary duty, and breach of contract and the duty of good faith and fair dealing. MFS was named in all four counts, while Crowe and Kiewit were named in Count I for violation of federal securities laws. Peter Kiewit notified Federal of the lawsuit in June 1994. In August 1994, Pompliano and his wife joined the suit as plaintiffs. Pompliano had served as president and CEO of MFS Telecom from January 1988 until April 1990. He was also a director and vice chairman of Telecom's board from April 1990 until June 1991. Federal learned of Pompliano's joining the lawsuit sometime between August and October 1994.

The complaint alleged that MFS had concealed material information from the plaintiffs prior to the sale of their shares of Telecom stock to MFS in September 1992. More specifically, the plaintiffs alleged that MFS had failed to inform them of its plan to implement an initial public offering of stock (IPO) in Telecom's parent company, MFS, and its retention of Salomon Brothers, an investment banking firm, to implement the sale. In light of the planned IPO, the plaintiffs alleged that stock was much more valuable at the time of sale than the price they received and that they would not have sold their shares had the defendants disclosed the material information. Plaintiffs also alleged that MFS engaged Salomon Brothers for advice concerning how to buy the minority shareholders' MFS Telecom stock prior to, and as part of the plan for, a public offering involving MFS Telecom.

Also allegedly unknown to the minority shareholders was the fact that during the negotiations to acquire their MFS Telecom stock, MFS was also secretly negotiating with British Telecommunications PLC regarding a potential substantial investment by British Telecom in MFS Telecom. The plaintiffs alleged that by failing to disclose this material information, MFS breached the shareholder agreement and the duty of good faith and fair dealing arising thereunder by inducing the minority shareholders to enter into the 1992 stock purchase agreements and thereby sell their MFS Telecom stock at an unfair price.

As to Crowe specifically, the complaint stated that on August 24, 1992, he "submitted to the Minority Shareholders a written offer to purchase their MFS Telecom stock

at a price of $135,000 per share. Because MFS Telecom was a private company, the minority shareholders were dependent upon defendants to provide them with complete, accurate and current information about the company so that they could evaluate MFS' offer." Count I of the complaint also contained allegations that Crowe was a controlling person of MFS within the meaning of Section 20(a) of the 1934 Securities Act and that he participated in and exercised control over the operations of MFS, including the decision to omit the material information.

Crowe had been CEO of MFSCC since its inception and was the highest ranking employee at the company. He had primary responsibility for establishing the strategic plans and objectives of MFSCC, including all aspects of capital acquisition such as public offerings, stock purchases, and mergers and acquisitions. For initiatives in these areas that required board approval, Crowe was responsible for making recommendations and presenting them to the board for approval.

The insurance policy did not require Federal to assume the defense of the lawsuit, and all three defendants retained the law firm Bartlit, Beck, Herman, Palenchar & Scot. In July 1994, Federal sent Kiewit a five-page letter summarizing its view of the allegations in the complaint and the terms of the policy.[2] Federal set forth specific policy provisions under which coverage might be denied, including the finding of fraud, intentional misconduct or personal profit, or the award of penalties or punitive damages. Federal concluded the letter with a reservation of rights under the policy to deny coverage or rescind the policy, stating that:

> it reserved all rights under the policy and available at law to deny coverage ... on additional and alternative bases as other terms, conditions, exclusions, endorsements, and provisions of the policy, including representations, statements, declarations and omissions in connection with the application therefor, are found to be applicable.

The letter also stated that Federal's "position as to the coverage for this matter [is] premised upon ... presently known facts and are by necessity subject to change as additional

... facts are developed through the course of discovery and further pleadings."

Although not responsible for control of the defense, Federal agreed to pay—after the $2.5 million deductible—80% of the defense costs based on a Federal claims adjuster's following assessment:

> "(g)iven the role of Mr. Crowe in negotiating the deal with the plaintiffs; in that he was the only person to discuss and finalize stock purchase with the plaintiffs, and that he came up with valuation based on his knowledge of the business, his role and defense of his activities is one key to the defense of this action ... Crowe's role does seem to be central to the defense of this action."

Federal noted in its July 1994 letter that assumption of defense costs did not waive its right to disclaim coverage at a future time if it determined that coverage was unavailable under the policy or at law.

Kiewit notified Federal for the first time at a June 19, 1996, meeting, less than a month before trial was scheduled to begin, that settlement of the lawsuit was a possibility. In a subsequent letter detailing Federal's current position as to coverage, Margaret Klimczyk, Federal's in-house counsel, indicated that settlement would not be covered because the damages appeared to be for the increased price of the shares and were therefore not attributable to Crowe:

> "In addition, I also reminded you of our previous discussions with respect to the damages issue. That is, I noted, again, our discussions that from my initial review of this matter, it appeared that the plaintiffs were seeking, as noted by the allegations they have brought, what they allege their stock should have been purchased for by the corporate defendant, MFSCC. Thus, from a cursory review, if the plaintiffs succeeded in this action, it appeared that the corporate entity who purchased the stock, MFSCC, would have to rescind the stock purchase, or pay, as damages, the appropriate price for the shares they purchased and that the additional payment MFSCC would owe to the plaintiffs for

---

**2.** This was before Pompliano joined the suit as a plaintiff.

their stock would not be covered under the policy."

In a follow-up letter dated June 26, 1996, Klimczyk reiterated this position, stating that "it would not appear that any amount paid as part of a settlement or judgment would be covered under the Policy."

Settlement negotiations were unsuccessful at that time and trial began on July 8, 1996. In opening statements, plaintiffs' counsel stated that the jury should find the defendants liable and "take the money back from the defendants ... and return it to my clients. And that's called compensatory damages." In their jury instructions, plaintiffs accused MFSCC of withholding information that Salomon Brothers had performed an assessment of MFSCC that reflected a much higher value than the price offered to the plaintiffs at the time of the sale of their minority interests; that Salomon Brothers had recommended that MFSCC consider undertaking an initial public offering and soliciting another experienced telecommunications company to invest in MFSCC as methods by which MFSCC could substantially enhance the value of MFSCC and Telecom. In addition, MFSCC had begun extensive preparations to pursue those recommendations and was implementing strategic expansion plans called for Telecom to operate in as many as 40 to 50 cities by 1999.

The parties continued their settlement negotiations, which were ultimately successful on the morning of July 9, 1996. In the settlement agreement, defendants agreed to pay $11.8 million to the plaintiffs in return for a release from all claims arising out of the plaintiffs' ownership of stock in Telecom. On July 15, 1996, by resolution of its board of directors, Kiewit indemnified Crowe in the underlying action for the full amount of the settlement amount and for all costs of the defense. The defense costs at that time totaled somewhere between $2.2 million and $2.64 million.

Federal denied coverage based on several provisions in the policy. First, it stated that coverage was barred as Crowe had not suf-

fered a "loss" as defined in the policy because the damages to the plaintiffs covered only the increased cost of the shares. Federal also disputed the allocation of 100% of the settlement amount to Crowe. Last, Federal relied on the "insured v. insured" exclusion in the policy and denied coverage because Pompliano's, a former director, was a plaintiff in the lawsuit.

As the excess policy did not attach until the $2,500,000 deductible and $10,000,000 Federal policy limits have been met, Pacific also denied coverage. Kiewit then brought the instant action seeking coverage under the two policies. All parties have moved for summary judgment.[3]

## II. Standard for Motion for Summary Judgment

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court must believe the evidence of the nonmoving party and construe the evidence in that party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"The plain language of rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, the party with the burden of proof on an issue may not rest on its pleadings and must make affirmative factual allegations to demonstrate that a genuine issue of material fact exists. *Id.* 477 U.S. at 324. Sufficient evidence that favors the nonmoving party must exist before a triable issue can be found. *Anderson,* 477 U.S. at 249.

---

**3.** In its motion for summary judgment, Pacific adopted Federal's arguments and statement of facts because its liability under the secondary

policy attaches only if liability exists for Federal under the primary policy.

## III. Discussion

### A. Choice of Law

 A threshold question for the court is which state's law controls the interpretation of the insurance policy. Determining which law governs in a diversity action is determined by the state in which the federal court sits. Therefore, the court must look to Illinois' choice-of-law principles to determine which state's law applies to this case. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Federal asserts that under Illinois Supreme Court and Seventh Circuit case law, Nebraska law applies. Illinois courts apply the "most significant contacts" approach in contract cases to determine which state's law governs. *See Palmer v. Beverly Enterprises,* 823 F.2d 1105, 1108–09 (7th Cir. 1987). Considerations under this doctrine include: "the place of contracting, negotiation, performance, location of the subject matter of the contract, and the domicile, residence, place of incorporation, and business of the parties." *Id.* at 1110. Here, the policy issued to Peter Kiewit, which has its principal place of business in Nebraska and whose risk manager is located in Nebraska. Crowe is also a Nebraska resident. The negotiations concerning the policy occurred in Nebraska and the policy includes a Nebraska amendatory endorsement, which is a required in policies "issued for delivery in Nebraska."

Kiewit responds that "it has yet to take a position on the applicable state law under conflicts of law principles" and maintains that it is not required to take a position at this juncture because the outcome remains the same regardless of which state's law applies. This is not an adequate response at the summary judgment stage or to Federal's assertions that Nebraska law applies. Kiewit does rely heavily on Nebraska law in its briefs, contradicting any position it might take that such law does not apply. It acknowledges that Illinois' "most significant contacts" rule controls but claims that the analysis under this rule does not yield Nebraska as a clear result, pointing out that Federal is an Indiana corporation with its principal office in New Jersey and that Kiewit is a Delaware corporation with its principal office in Nebraska. Although Crowe was a Nebraska resident who worked primarily in his Nebraska office, Kiewit claims that the face-to-face negotiations regarding the MFS Telecom stock occurred in Illinois. The underlying suit was also filed and settlement liabilities incurred in Illinois.

 However, the considerations concerning the underlying suit are not relevant to the court's determination of which state's law applies to interpreting the insurance policy. *See American Mutual Liability Insurance Co. v. Beatrice Companies, Inc.,* 924 F.Supp. 861, 869–70 (N.D.Ill.1996) ("the only connection between this case and Massachusetts is that the underlying claim arose there"). It is the actions regarding the policy formation and the policy itself—not the actions concerning covered occurrences—that are relevant to the court's determination of which state has the most significant contacts to the policy. *Lapham–Hickey Steel Corp. v. Protection Mutual Insurance Co.,* 166 Ill.2d 520, 211 Ill.Dec. 459, 655 N.E.2d 842, 845 (1995). In this case, that is Nebraska, where the insureds reside or have their principal place of business and where the policy was issued.

When applying Nebraska law, this court is bound by the holdings of the Nebraska Supreme Court. If the issues raised have not yet been addressed by the Nebraska Supreme Court, the court "must attempt to predict what that court would decide if it were to address the issue." *Lindsay Manufacturing Co. v. Hartford Accident Indemnity Co.,* 118 F.3d 1263, 1268 (8th Cir.1997).

 Under Nebraska law, "an insurance contract is to be construed as any other contract to give effect to the parties' intentions at the time the contract was made. When the terms of the contract are clear, they are to be accorded their plain and ordinary meaning. While an ambiguous policy will be construed in favor of the insured, an ambiguity will not be read into policy language which is plain and unambiguous in order to construe it against the preparer of the contract." *Design Data Corp. v. Maryland Casualty Co.,* 243 Neb. 945, 503 N.W.2d 552, 559 (1993).

 "When interpreting the plain meaning of the terms of an insurance policy, we have

stated that the natural and obvious meaning of the provisions in a policy is to be adopted in preference to a fanciful, curious, or hidden meaning." *Katskee v. Blue Cross/Blue Shield of Nebraska,* 245 Neb. 808, 515 N.W.2d 645, 649 (1994). With these concepts in mind, the court turns to the parties' arguments regarding the interpretation of the insurance policy at issue.

## B. Insured v. Insured Exclusion

Federal denied coverage under the policy's "insured v. insured" exclusion because Pompliano, a former director or officer of the company, was a plaintiff in the lawsuit against Crowe, a current director or officer. Federal asserts that the plain language of the exclusion compels this result: "[Federal] shall not be liable for loss on account of any claim made against any insured person ... brought or maintained by or on behalf of any insured." An "insured person" included "any person who has been, now is, or shall become a duly elected director or a duly elected or appointed officer of the Insured Organization." The term "insured" included "the insured organization and any insured person."

Kiewit claims that denial of coverage was in error for the following reasons: 1) the insured v. insured exclusion does not apply to lawsuits filed by a "genuinely adverse party" such as Pompliano, who resigned from MFS Telecom almost two years before the allegedly wrongful acts occurred; 2) the exclusion does not apply because Pompliano was not suing in his capacity as a former director or officer but as an uninsured shareholder; 3) Federal is estopped from relying on this provision because it first raised it two years after it learned of Pompliano's addition to the lawsuit and six weeks after the settlement was executed; and 4) Pompliano's presence as a plaintiff should not bar coverage completely as he was only one of eight plaintiffs. Kiewit argues that it is unclear if the "insured v. insured" exclusion was intended to cover former directors and officers and asserts that under Nebraska law, ambiguities in an insurance policy must be construed most favorably to the insured and against the insurer. Federal responds that the exclusion is unambiguous and that when this is true, a court may not look beyond the policy's plain language in an attempt to determine the

intention of the parties. *Kast v. American–Amicable Life Insurance Co. of Texas,* 251 Neb. 698, 559 N.W.2d 460, 464 (1997).

Plaintiff accuses defendant of attempting to use this broad definition of "insured person," which was intended to expand coverage, as an escape hatch to liability. This "rigid and literalistic" approach, as plaintiff terms it, applies the literal meaning of the words without regard to the intent or reasonable expectations of the parties. This is incorrect, according to plaintiff, because the "policy should be interpreted in accordance with reasonable expectations of the insured at the time of the contract. A contract of insurance should be given a reasonable construction so as to effectuate the purpose for which it was made." *Decker v. Combined Insurance Co. of America,* 244 Neb. 281, 505 N.W.2d 719, 722 (1993).

As support for its interpretation of the exclusion, plaintiff cites *Fidelity and Deposit Co. of Maryland v. Zandstra,* 756 F.Supp. 429, 431–32 (N.D.Cal.1990). In *Zandstra,* an insurer brought a declaratory action, seeking a determination that it was not required to defend or indemnify former directors and officers of a failed savings and loan. The policy included an "insured v. insured" exclusion, which stated that Fidelity was not liable for claims made against directors and officers by Homestate, the insured bank. The Federal Deposit Insurance Corp. had been appointed receiver of the bank and was pursuing Homestate's lawsuits against several directors and officers of the bank. The issue was whether the exclusion applied when "the claim has devolved ... upon the FDIC." *Id.* at 431. The court, applying California law, held that the "obvious intent" behind the exclusion was to prevent collusive suits. In so deciding, it looked to the exclusion's exception for shareholder derivative actions. This exception convinced the court that "Fidelity intended to place itself on the risk for actions against the directors and officers based upon allegations of mismanagement, waste, fraud, or abuse of Homestate. These are precisely the claims being brought by FDIC against the directors and officers now." *Id.* Although the underlying actions had originally been brought by Homestate, the insured, the court found that there was

no doubt that the FDIC was an adverse party and that the exclusion therefore did not apply. *Id.* at 432.

Similarly, in *Conklin Co., Inc. v. National Union Fire Insurance Co.*, 1987 WL 108957 (D.Minn.), the plaintiffs sought a declaration that the insured v. insured exclusion in their directors and officers policy did not apply to a former director's wrongful discharge action. The policy provided that it shall "pay on behalf of each and every person who was or now is or may hereafter be a director or officer of the company ... ("the insureds") against loss ... arising from any claim or claims which are first made against the insureds, jointly or severally, during the policy period by reason of any wrongful act ... in their respective capacities as directors or officers." The exclusion stated that "the insurer shall not be liable to make any payment for loss ... under this policy in connection with any claim made against the insureds by an insured."

The court found that the former director was not an insured under the policy because his wrongful discharge action was adverse and could not be considered a collusive or friendly suit. "Insured v. insured" clauses were intended to prevent "a corporation from suing its own directors or officers to obtain the benefits of its own D & O policy coverage." *Id.* at *2 (citing 21 Tort and Insurance Law Journal 269, 285 (1986)). Likewise, in *Township of Center v. First Mercury Syndicate Inc.*, 117 F.3d 115 (3rd Cir.1997), the issue was "whether the 'insured v. insured' exclusion should prevent coverage of a wrongful discharge action even though, when the claim was made, the discharged employees were no longer employed by the Township." *Id.* at 117. The district court had found "that the relevant time period for determining the applicability of the exclusionary clause was the point when the alleged wrongful acts of the Township defendants occurred, not when the claims against them were made." *Id.* at 118. Therefore, the court found that at the time of their firing, the plaintiffs were directors or officers, and therefore "insureds" under the policy exclusion. *Id.* The Third Circuit reversed, finding that the policy was a "claims made" policy and the relevant time for determining wheth-

er someone was an "insured" was at the time the suit was filed. *Id.* It then noted the reason for the exclusion, which was to prevent collusive suits, such as a company seeking coverage from its insurer for the poor business decisions of its officers. In a case where the underlying action could not be considered collusive, the exclusion would not apply. *Id.* at 119.

In *Township*, the policy defined an "insured" as "all persons acting within the scope of their official duties who were, now are or shall be lawfully elected or lawfully appointed officials and members of the 'Governmental Entity.'" *Id.* at 117. Federal distinguishes *Township* because the definition of "insured" in the that policy did not include former directors or officers because such persons could not be "acting within the scope of their official duties." The instant policy contains no such limitation and therefore applies to all persons who were directors or officers, regardless of whether they are acting within the scope of their official duties. *See also Howard Savings Bank v. Northland Insurance Co.*, 1997 WL 460973 (N.D.Ill.). In *Howard*, the policy defined an "insured person" as: "any past, present or future director or officer of the insured financial institution, while acting solely in the capacity of director or officer of the insured financial institution ..." The court held that a former officer bringing a wrongful discharge action could not be considered an "insured" because a former employee could not be "acting solely in the capacity of director or officer." *Id.* at *5. "If defendant really meant for all past, present, or future officers and directors to be considered insured persons under its policy, defendant should have drafted its policy to define an insured person as a past, present, or future officer or director. Defendant, however, added the phrase 'while acting solely in the capacity of director or officer.'" *Id.* Federal and Kiewit, however, did *not* include the phrase "acting solely in the capacity of director or officer" in the policy's definition of an "insured." The court finds *Township* distinguishable on that basis. Not only is the policy language in *Township* and *Howard* distinguishable, it actually lends support to the view that the policy definition at issue—which does not include the key phrase "while acting solely in the capacity of director or

officer"—would include all former directors and officers, regardless of the capacity in which they sue or the nature of the suit.

The additional problem the court sees with *Conklin* and *Zandstra*, and the objection Federal raises to the reasoning in these cases, is that the courts found no ambiguity in the plain language of the clauses themselves. Instead, the ambiguity of the clause was created when looking beyond the language to the purpose of the clause. Because the alleged purpose was to prevent collusive suits, the courts found the clause ambiguous when presented with an adversarial lawsuit. Looking to the purpose, the courts then found that these suits would not be barred by the exclusion because they were not collusive. *See Township*, 117 F.3d at 119; *Conklin* at *2; *Zandstra*, 756 F.Supp. at 431.

■ Federal maintains that Nebraska law does not permit the result Kiewit claims is required because the clause at issue is clear on its face. If a clause contains no ambiguity, the court is barred from looking outside it to question the intent of the clause. *Kast v. American–Amicable Life Insurance Co. of Texas*, 251 Neb. 698, 559 N.W.2d 460, 464 (1997).

> When the terms of the contract are clear, a court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning as the ordinary and reasonable person would understand them. In such a case, a court shall seek to ascertain the intention of the parties from the plain language of the policy.

*Katskee v. Blue Cross/Blue Shield of Nebraska*, 245 Neb. 808, 515 N.W.2d 645, 649 (1994). The exclusion in the policy at issue in this case states that Federal: "shall not be liable for loss on account of any claim made against any insured person ... brought or maintained by or on behalf of any insured ..." The policy's definition of an "insured" is:

"any person who has been, now is, or shall become a duly elected director or a duly elected or appointed officer of the insured organization."

■ Pompliano had been a duly elected officer and director of the insured organization. He was therefore an "insured" under the plain language of the policy. The exclusion itself does not distinguish among types of insureds in terms of former, current or future directors or officers and it does not refer in any way to collusive lawsuits. The language is not susceptible to more than one meaning and therefore is not ambiguous. *Brown v. Farmers Mutual Insurance Co. of Nebraska*, 237 Neb. 855, 468 N.W.2d 105, 115 (1991). If the policy's terms are clear, they should be interpreted according to their plain and ordinary meaning. *Allstate Insurance Co. v. Farmers Mutual Insurance Co.*, 233 Neb. 248, 444 N.W.2d 676 (1989). Nor have courts universally found that the "insured v. insured" exclusion does not apply to former directors or officers when there is no evidence of a collusive suit. *See Parker v. Watts*, 1987 WL 7450, *3 (E.D.La.); *Bendis v. Federal Insurance Co.*, 1989 WL 161437 (D.Kan.); *Voluntary Hospitals of America, Inc. v. National Union Fire Insurance Co.*, 859 F.Supp. 260, 263 (N.D.Tex.1993) *aff'd* 24 F.3d 239 (Table) (5th Cir.1994) ("the definition of 'insured' does not deconstruct itself into ambiguity"); *Foster v. Kentucky Housing Corp.*, 850 F.Supp. 558 (E.D.Ky.1994) (noting that the result in *Conklin* would be incorrect under Kentucky law). These courts all found the "insured v. insured" exception language unambiguous. Although Kiewit claims that this interpretation conflicts with the reasonable expectation of the insured at the time of contracting, it does not explain how this is so. When the language of a contract is unambiguous, the court ascertains the intention of the parties from the plain language of the policy. *Katskee*, 515 N.W.2d at 649.[4]

---

**4.** Kiewit's purported reason for the clause is also not necessarily the only reason. The court in *Township* cites *American Casualty Co. v. FDIC*, 1990 WL 66505 (N.D.Iowa) and quotes that court's observation that the purpose of the exclusion is to exclude coverage for "internecine warfare and collusive suits." *See also Parker*, 1987 WL 7450 at *2 ("The exclusion was designed to exclude 'family disputes' which arise between

officers and directors of an institution"). "Internecine warfare" and "family disputes" refer to conflict and dissension—as opposed to collusion—within a group. Indeed, the reference to family disputes brings to mind the heightened emotion often present in divorce and custody cases and in lawsuits involving opponents who were formerly allies. In the court's experience, cases involving personal acrimony between the

Despite Kiewit's assertion that this interpretation requires the "court to read [the policy's] words blindly, in total isolation of the remainder of the contract," the court finds that the opposite is actually true. Additional support for the court's position is found in the language of the exceptions to the exclusion, which further convinces the court that suits brought by former directors or officers are not covered under the policy. One of the exceptions to the exclusion is: "a claim brought or maintained by an insured person for the actual or alleged wrongful termination of the insured person." The cases involving such a suit for wrongful termination that Kiewit cited as support, the exclusions did not include such an exception. This exception would be unnecessary if the court followed plaintiff's interpretation of the exclusion because such suits, which are clearly adversarial, would already be excluded. In fact, both *Conklin* and *Township* involved suits for wrongful termination. Under the instant policy, the underlying actions in those cases would be covered. In addition, the presence of explicit exceptions to the insured v. insured exclusion render additional exceptions not included in this section suspect.

For the aforementioned reasons, the court finds the Federal's denial of coverage under the insured v. insured exclusion in the policy was proper.

### C. Suing in Shareholder Capacity

Kiewit also claims that the insured v. insured clause does not apply to the instant case because Pompliano was not suing in his capacity as a former officer or director of MFS Telecom but instead was suing as an ordinary shareholder. Kiewit cites *Conklin* for the proposition that a former officer suing "in his own right" is not an "insured" that triggers the exclusion. This argument fails for the same reasons as the argument concerning adversarial suits—it requires a reading of the clause that disregards its plain language.

The policy bars "any claim" brought by "any insured." The definition of "insured" does not turn on the capacity in which the person acts but simply whether the person

"has been . . . a duly elected director or a duly elected or appointed officer of the insured organization." The exceptions to the exclusion again provide additional guidance. Derivative actions, which are technically brought by the corporation (or insured), are not excluded from coverage under the policy. This changes, however, if an insured solicits, assists or participates in the suit. An insured participating in a derivative action would not be doing so as a director or officer but as "an ordinary shareholder." Therefore, Pompliano's status as a shareholder in the underlying action is irrelevant because he was an "insured" under the policy.

### D. The Exclusion Does Not Bar the Entire Settlement Amount

As an alternative basis for coverage, plaintiff claims that even if the "insured v. insured" exclusion applies to the instant facts, it does not bar the entire $14.4 million settlement amount and defense costs. Pompliano owned only 16% of the shares at issue in the underlying case and plaintiff claims that only this much of the settlement award would be barred if the exclusion applies. Kiewit points to the allocation clause in the policy and states that it requires Federal to "use its best efforts to agree on a fair and proper allocation" because the "claim against the insured person( ) includes both covered and uncovered matters." Because defense costs would have been the same regardless of whether Pompliano joined the suit, plaintiff asserts that 100% of these costs should be covered.

The policy bars "any claim made against an insured person brought or maintained by or on behalf of any insured." A claim is defined as a "civil proceeding commenced by the service of a complaint or similar pleading." Federal asserts that the policy language is clear that a claim constitutes the entire civil proceeding and that it cannot be apportioned between insureds and non-insureds. In addition, the allocation provision of the policy does not support plaintiff's argument because it refers to "covered

parties often makes both sides unable to objectively assess the merits of their position, prolonging and complicating the litigation. This pro-

vides an additional purpose for refusing to insure such litigation.

and uncovered matters" that are included within a civil proceeding or claim. It does not refer to covered and uncovered parties, which is addressed instead in the insured v. insured exclusion.

Again, the plain language of the policy and of the exclusion's other exceptions support Federal's arguments. Federal "shall not be liable for loss on account of any [civil proceeding] made against any insured person ... brought or maintained by or on behalf of any insured." This language clearly bars coverage in this instance. The "insured v. insured" exclusion does not apply to a derivative action as long as the shareholder plaintiffs "bring and maintain the claim without the solicitation, assistance or participation of any insured." In other words, if any insured joins or even aids the plaintiffs in an action, coverage for the entire proceeding is barred. This language would not be necessary if the "insured v. insured" exclusion barred only the portions of a civil proceeding that could be directly attributed to the insured. Therefore, the court finds that the exclusion bars coverage for the entire proceeding.

### E. Estoppel

Kiewit argues that even if the court finds that Pompliano is an insured under the policy, Federal is estopped from applying the "insured v. insured" exclusion because it waited almost two years after learning of Pompliano's addition to the lawsuit before raising the possibility that this exclusion applied. Under Nebraska's "mend the hold" doctrine, Kiewit claims that "once the insurer has taken one position with respect to a claim, it cannot be allowed to 'mend its hold' by taking another after the underlying litigation has commenced," citing as support *Erickson v. Carhart*, 1996 WL 674334 (Neb. App.) *Boren v. State Farm Mutual Auto. Insurance Co.*, 225 Neb. 503, 406 N.W.2d 640 (1987).

Under Nebraska law, the doctrine of "mending one's hold" prevents a party from claiming a particular reason for denying liability and then relying on a separate and different reason after litigation over the matter has begun. *Design Data Corp. v. Maryland Casualty Co.*, 243 Neb. 945, 503 N.W.2d 552, 558 (1993) (citing *Boren* and *Mutual Benefit Life Insurance Co. v. Chisholm*, 213

Neb. 301, 329 N.W.2d 103 (1983)). This estoppel doctrine, which did not originate in the insurance context, has been applied to cases involving disputes over insurance coverage. *Id.* 503 N.W.2d at 559.

Generally, estoppel may not be used to expand an insurance policy's coverage to include risks that the policy specifically excludes. *First United Bank of Bellevue v. First American Title Insurance Co.*, 242 Neb. 640, 496 N.W.2d 474, 480 (1993). An exception to this rule exists when "an insurance company assumes the defense of an action against its insured, without reservation of rights, and with knowledge, actual or presumed, of facts which would have permitted it to deny coverage, it may be estopped from subsequently raising the defense of non-coverage." *Id.* To establish that an insurer is estopped from denying coverage, the insured must show: 1) the insurer had knowledge of circumstances indicating non-coverage; 2) the insurer assumed or continued defense of the insured without obtaining an effective reservation of rights; and 3) the insured suffered some type of harm or prejudice." *Id.*

Federal answers that Kiewit has misstated applicable case law and that under Nebraska law, estoppel does not apply in these circumstances. It claims that plaintiff's statement that the "mend the hold" doctrine does not allow an insurer to change its position once the *underlying* litigation between the insured and another party has begun is a misrepresentation of the law—it is the litigation between insurer and insured that is relevant. Therefore, according to Federal, plaintiff's admission that Federal raised the "insured v. insured" exclusion in an August 23, 1996, meeting, before the instant litigation commenced, bars the "mend the hold" doctrine. Also, Federal asserts that estoppel does not apply here because 1) it did not assume the defense of the underlying action; 2) it issued a reservation of rights under the policy; and 3) Kiewit cannot demonstrate any prejudice for Federal's delay in citing this bar to coverage. *Id.*

There is no dispute that Federal did not assume or control the defense in the underlying action. In response, Kiewit

claims that "the critical element is detrimental reliance by the insured" and that it establishes such because it considered moving to dismiss Pompliano from the case under a statute of limitations defense. Had it known that Federal would later deny coverage based on Pompliano's inclusion in the lawsuit, Kiewit states that it would have pursued the motion to dismiss. This argument ignores that detrimental reliance requires proof of inducement, which is addressed in the prong: "the insurer assumed or continued defense of the insured without obtaining an effective reservation of rights."

Plaintiff does cite one case in which a Nebraska court did not require the insurer to have assumed the insured's defense before finding estoppel. *Grevson v. AMCO Insurance Co.*, 1997 WL 408327 (Neb.App.). In *Grevson*, the Nebraska appellate court found that a genuine issue of material fact existed as to whether the insurer's claims representative directed Grevson, an individual seeking coverage under his auto insurance policy, to file a claim in small claims court. Grevson had been involved in a collision with an uninsured motorist. His policy did not cover property damage and the claims representative allegedly told him to seek recovery for such damage in small claims court. Grevson did so, obtaining a judgment against the uninsured motorist. AMCO subsequently denied payment under the policy because the suit in small claims court had destroyed its subrogation rights under the policy. *Id.* at *3. The court found estoppel could apply under these circumstances. *Id.* at *8.

Federal did not exercise the kind of control over the litigation in the underlying case that was present in *Grevson*. Not only did Federal not assume Kiewit's defense, it did not direct Kiewit's attorneys to take any specific action. Federal's presence at meetings where trial strategy was discussed does not by itself lead to the conclusion that it induced Kiewit to forego the motion to dismiss. Kiewit claims that it would have made a different decision about moving to dismiss Pompliano had it known Federal's position as to coverage. However, it admits that the decision not to so move was based on strategic reasons of its own that Federal did not suggest.

Another important distinction between the instant case and *Grevson* is that the Nebraska court relied on Grevson's *pro se* status in making its determination that estoppel might be applicable in the case. "The evidence shows that Grevson was a very ordinary insured." *Id.* at *7. He did not seek legal advice as to his insurance policy or as to his suit in small claims court. In contrast, Kiewit, represented by a full panoply of its own counsel in the underlying action and as to coverage under the policy, is not "an ordinary insured." "Estoppel cannot arise where the truth is known to both parties or where they both have equal means of knowledge, and nothing is done by one of them to mislead the other." *Id.* (citing 31 C.J.S. Estoppel and Waiver § 86 (1996)). The Nebraska court's ruling was based on an insurer's superior knowledge of the terms and effects of policies than an ordinary insured would be expected to have. *Id.* For these reasons, *Grevson* is distinguishable from the instant case.

Kiewit also objects to Federal's reliance on its reservation of rights under the policy because in it, Federal stated that its current position was based on "presently known facts and circumstances." As Federal knew all along that Pompliano was a plaintiff in the case, Kiewit claims that it cannot change its position now simply because it included a reservation of rights in its coverage letters. Although Kiewit maintains that this reservation referred only to a change in Federal's position should additional facts come to light, it does include the statement that "(Federal) expressly reserve(s) all rights under the policy and available at law to deny coverage ... on additional or alternative bases as other terms, conditions, exclusions, endorsements and provisions of the policy ... are found to be applicable." In the court's view, this reservation was more general than Kiewit contends and was not based only on the possibility of additional facts coming to light. It specifically reserves the right to apply additional exclusions. Combined with Federal's lack of control over the defense of the underlying litigation, the court must find that Federal is not estopped from applying the exclusion in this case under Nebraska law.

## IV. Conclusion

The court finds that the "insured v. insured" exclusion in the policy legitimately bars coverage in this case and that Federal is not estopped from denying coverage under this policy provision. Because coverage is completely barred under this exclusion, the court need not address the additional denials of coverage based on whether the entire settlement amount was properly allocated to Crowe and whether the settlement amount constituted a "loss" under the policy. Because plaintiff's policy with Pacific Insurance contained the same exclusions and did not provide coverage until the limits of its policy with Federal had been paid, plaintiff cannot claim that coverage is due under its policy with Pacific.

Plaintiff Kiewit's motion for summary judgment is denied. Defendants Federal Insurance Company's and Pacific Insurance Company's motions for summary judgment are granted.

**ORDERED:** For the foregoing reasons, the court grants defendants' motions for summary judgment and denies plaintiff's motion for summary judgment.